NICK A. ARTUKOVICH AND STELLA M. ARTUKOVICH, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2686–70.    Filed October 29, 1973.

---

[2] See and compare *Raymond S. August*, 54 T.C. 1535 (1970), and particularly fn. 2 on p. 1539.

*Richard W. Craigo* and *Mark D. Pastor*, for the petitioners.
*Robert E. Casey*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined a deficiency in petitioners' Federal income tax for 1965 in the amount of $29,677.43. The only issue is whether Ron Waller Enterprises, Inc., a corporation in which petitioners were the sole shareholders, filed a timely election under section 1372(a)[1] to be taxed as a small business corporation for its taxable year ended November 30, 1965.

### FINDING OF FACT

Nick A. Artukovich (hereinafter referred to as petitioner) and Stella M. Artukovich were legal residents of Arcadia, Calif., at the time they filed their petition. They filed a joint Federal income tax return for 1965 with the district director of internal revenue at Los Angeles, Calif.

Prior to December 3, 1964, petitioner and Ron Waller (hereinafter Waller) agreed to open a restaurant-nightclub under the name "Ron Waller's Pro Room." The establishment was to be located at 358 South La Cienega Boulevard in Los Angeles, and it was to occupy premises known as the "Ming Room," which had been owned and operated by Ming Enterprises, Inc. Waller was to manage the restaurant-nightclub, and petitioner was to advance the needed funds in amounts to be determined later.

On or about December 3, 1964, petitioner and Waller opened negotiations with Fred F. Jamison (hereinafter Jamison), the lessor of the Ming Room premises, and Haskell H. Grodberg (hereinafter Grodberg), the assignee for the benefit of the creditors of Ming Enterprises, Inc. An agreement was reached whereby Jamison and Grodberg would be paid cash in the total amount of $18,600. This payment was to be allocated to the prepayment of rent on a 10-year lease ($2,600), consideration for the assignment of a general license for the sale of alcoholic beverages (hereinafter the liquor license) ($10,000), and payment for all leasehold improvements and related property ($6,000).

During December of 1964, petitioner expended, either directly or through Waller, the full $18,600 in the following transactions:

(a) On December 3, 1964, a 10-year lease agreement was executed by Jamison, as lessor, and Waller, as lessee. Petitioner paid Jamison

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

$2,600 as rent for the first month ($500) and the last 3 months ($2,100) of the lease.

(b) On December 11, 1964, Grodberg was paid $10,000 as a deposit for the purchase of a liquor license.

(c) During December of 1964, Grodberg was paid $6,000 for the leasehold improvements and related property.

On December 23, 1964, articles of incorporation of Ron Waller Enterprises, Inc. (hereinafter Enterprises), were filed with the secretary of state of the State of California. The first meeting of the organizers of Enterprises and the first meeting of its board of directors were held on January 4, 1965. Enterprises was a "small business corporation" within the meaning of section 1371(a) during the entire period here in controversy.

On January 8, 1965, an escrow agreement was entered into between Enterprises and Grodberg, as assignee for the benefit of the creditors of Ming Enterprises, Inc., to consummate the sale of the liquor license from Grodberg to Enterprises for the agreed price of $10,000. The Union Bank, Los Angeles Head Office, served as escrow holder. Pursuant to the terms of the escrow, Enterprises agreed to pay, outside of escrow, the amount of $607.50, representing renewal fees ($580) and transfer fees ($27.50). The transfer of the liquor license, the subject of the escrow, was contingent upon the approval of the California Department of Alcoholic Beverage Control.

On January 13, 1965, the Union Bank, Beverly Hills Branch, loaned Enterprises the amount of $20,000. On the same day, Enterprises opened two separate corporate bank accounts with the Union Bank and deposited the proceeds of the loan as follows: $18,000 in an account designated as a "general" account, and $2,000 in an account designated as a "special" account. Expenditures from these accounts were recorded in journals maintained by Enterprises.

On February 5, 1965, Enterprises filed an application with the commissioner of corporations of the State of California for a permit to issue 500 shares of its capital stock to petitioner.

On February 17, 1965, Waller executed a written assignment of the Jamison lease to Enterprises, and Enterprises accepted this assignment. On February 27, 1965, Jamison consented, in writing, to the assignment.

During January 1965 and continuing through February 26, 1965, certain expenditures were made by N. A. Artukovich Constructors, a partnership controlled by petitioner, and by Enterprises for the purpose of completely remodeling the leased premises and putting them in condition to carry on the restaurant-nightclub business. These expenditures covered the costs of labor, building materials, lighting

fixtures, air-conditioning refurbishment, carpeting, a business sign, dining booths, and the services of a decorator. The total amount expended by N. A. Artukovich Constructors was $1,075.50. Enterprises expended a total of $7,293.78 for the remodeling; this sum was disbursed from Enterprises' accounts with the Union Bank.

During January 1965 and continuing through February 26, 1965, certain other expenditures were made by Enterprises. These payments covered the costs of legal fees, printed matter, licenses (other than the liquor license) required to carry on the restaurant-nightclub business, rent on the leased premises, deposits for utilities, the cost of leasing an automobile utilized by Waller, and the transfer and renewal fees for the liquor license. The total amount expended by Enterprises during this period was $2,631.68. The expenditures were made from the Union Bank accounts.

On March 11, 1965, the commissioner of corporations of the State of California granted Enterprises a permit authorizing it to issue 500 shares of its capital stock for $5,000 to petitioner. On March 22, 1965, Enterprises issued 500 shares of its capital stock to him.

On March 25, 1965, Enterprises filed an executed Form 2553, "Election by Small Business Corporation," with the Internal Revenue Service. On the same date, petitioners executed and filed with the Internal Revenue Service a shareholders' consent to the election by Enterprises.

On or about April 10, 1965, the California Department of Alcoholic Beverage Control approved the transfer of the liquor license from Grodberg to Enterprises, and the liquor license escrow was closed.

Ron Waller's Pro Room was opened to the public on April 20, 1965. The business proved financially unsuccessful, and Enterprises terminated the business during August 1965.

Enterprises sustained a net operating loss of $49,278.47 during its taxable year ended November 30, 1965. Petitioners claimed this loss in their joint income tax return for 1965.

On February 11, 1966, Enterprises filed an executed Form 1120–S, "U.S. Small Business Corporation Return of Income," with the district director of internal revenue at Los Angeles. This was the initial corporate income tax return filed by Enterprises with the Internal Revenue Service. Enterprises is still in existence, but it is not engaged in the restaurant-nightclub business.

In the notice of deficiency, respondent determined that Enterprises was not an electing small business corporation for its taxable year ended November 30, 1965, within the meaning of sections 1371 through 1378. Respondent further determined that Enterprises' net operating

loss of $49,278.47 for such taxable year was not allowable to petitioners as a deduction in computing their income for 1965.

OPINION

Section 1372(a) [2] permits a "small business corporation" to elect not to be subject to Federal income taxes. However, such election must be timely. Section 1372(c)(1) [3] provides that the election may be made "at any time during the first month" of any taxable year or "at any time during the month preceding such first month." The amplifying regulations state that, in the case of a new corporation, the first month of the taxable year does not begin "until the corporation has shareholders or acquires assets or begins doing business, whichever is the first to occur." Sec. 1.1372-2(b)(1), Income Tax Regs. [4] Any of these three events will start the running of the first month of the taxable year. *Rowland* v. *United States*, 315 F. Supp. 596, 599-600 (W.D.Ark. 1970). [5]

The only question is whether Enterprises' election, filed March 25, 1965, was timely. If so, petitioners are entitled to deduct the full amount of the net operating loss incurred by Enterprises; otherwise, they are not entitled to such deduction.

---

[2] SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION.

(a) ELIGIBILITY.—Except as provided in subsection (f) [not applicable in this case], any small business corporation may elect, in accordance with the provisions of this section, not to be subject to the taxes imposed by this chapter. Such election shall be valid only if all persons who are shareholders in such corporation—

(1) on the first day of the first taxable year for which such election is effective, if such election is made on or before such first day, or

(2) on the day on which the election is made, if the election is made after such first day,

consent to such election.

[3] SEC. 1372(c). WHERE AND HOW MADE.—

(1) IN GENERAL.—An election under subsection (a) may be made by a small business corporation for any taxable year at any time during the first month of such taxable year, or at any time during the month preceding such first month. Such election shall be made in such manner as the Secretary or his delegate shall prescribe by regulations.

[4] Sec. 1.1372-2 Manner and time for making election and filing shareholders' consent.

(b) *Time of making election*—(1) *Taxable years beginning on or after September 3, 1958.* For taxable years beginning on or after September 3, 1958 [the day after the date of enactment of subchapter S of the Code, Pub. L. 85-866, 72 Stat. 1650], the election shall be filed either (i) during the first month of such taxable year, or (ii) during the month preceding such first month. In the case of a new corporation whose taxable year begins after the first day of a particular month, the term "month" means the period commencing with the beginning of the first day of the taxable year and ending with the close of the day preceding the numerically corresponding day of the succeeding calendar month or, if there is no such corresponding day, with the close of the last day of such succeeding calendar month. For purposes of this subparagraph, the first month of the taxable year of a new corporation does not begin until the corporation has shareholders or acquires assets or begins doing business, whichever is the first to occur.

[5] A purported election made by a new corporation before any one of the three events has occurred is ineffectual. *J. William Frentz*, 44 T.C. 485, 488-490 (1965), affirmed by order 375 F.2d 662 (C.A. 6, 1967).

Petitioners take a rather unusual position. They argue that the language of section 1372(c)(1) is clear and unequivocal in keying the time for the election to the beginning of the taxable year of the corporation, citing *Ajax Engineering Corp.*, 17 T.C. 87 (1951), affirmed per curiam 196 F.2d 727 (C.A. 3, 1952), for the proposition that "The first taxable year of a new corporation commences on the date of incorporation." Since Enterprises was incorporated on December 23, 1964, and did not file its election until March 25, 1965, this argument implicitly concedes that the election was not made within the time prescribed by section 1372(c)(1), the controlling statute.

Petitioners urge, however, that section 1.1372–2(b)(1) of the regulations negates and "completely recasts this clear statutory standard by providing that the first taxable year of a new corporation does not begin until the corporation 'has shareholders, or acquires assets or begins doing business, whichever is the first to occur.'" Petitioners maintain that this regulation, though ambiguous, liberalizes the statutory requirement by giving additional time to new corporations within which to make the election. Petitioners insist that, within the meaning of this regulation, Enterprises did not have shareholders, acquire assets, or begin doing business prior to February 26, 1965, 1 month before the election was made.

Section 1372(c)(1) is addressed primarily to the situation of previously existing corporations, permitting them to make the election either in the month preceding the beginning of the taxable year or in the first month of the taxable year of such corporation. The statute does not deal specifically with elections by newly created corporations, and the regulation referred to above fills this gap by stating when "the first month of the taxable year of a new corporation" begins for purposes of making this election. The regulation disregards the period when the corporation is merely a hollow shell without shareholders, assets, or a business, and keys the time for the election to the date on which "the corporation has shareholders or acquires assets or begins doing business, whichever is the first to occur." [6]

---

[6] Sec. 1.6012–2(a)(2), Income Tax Regs., prescribes a procedure whereby dormant corporations may avoid the necessity for filing returns as follows:

Sec. 1.6012–2 Corporations required to make returns of income.

(a) *In general.*—* * *

(2) *Existence of corporation.* A corporation in existence during any portion of a taxable year is required to make a return. If a corporation was not in existence throughout an annual accounting period (either calendar year or fiscal year), the corporation is required to make a return for that fractional part of a year during which it was in existence. * * * *If a corporation has received a charter but has never perfected its organization and has transacted no business and has no income from any source, it, may upon presentation of the facts to the district director be relieved from the necessity of making a return.* In the absence of a proper showing of such facts to the district director, a corporation will be required to make a return. [Emphasis supplied.]

As noted above, section 1372(c) (1), as well as section 1.1372–2(b) (1) of the regulations dealing with new corporations, uses the term "taxable year" in prescribing the election timetable. That term is defined by section 7701(a) (23) to mean "the calendar year, or the fiscal year ending during such calendar year, upon the basis of which the taxable income is computed." The crucial considerations are, thus, the computation of taxable income and the period for which it is to be computed, and the regulation merely keys the time for the election to events which have potential taxable consequences under sections 1371 through 1378 for either the shareholders or the corporation. We do not think there is any inconsistency between section 1372(c) (1) and the regulation, and we think the regulation is a reasonable interpretation of the section.[7] Cf. *United States* v. *Correll*, 389 U.S. 299, 307 (1967).

Petitioners admit that the $20,000 in cash received by Enterprises from the January 13, 1965, loan is an "asset" within the ordinary meaning of that word, and they acknowledge that one of the standards employed in the regulation for determining when a corporation's first taxable year begins is the corporation's acquisition of assets. However, they argue that Enterprises did not acquire assets within the meaning of section 1.1372–2(b) (1), Income Tax Regs., prior to February 26, 1965, because, they maintain, the regulation applies only to "the acquisition of operating assets essential to the conduct of the business" rather than "passive, non-operating, bookeeping-type [sic] assets." Petitioners contend that this is the only reasonable interpretation of the "ambiguous and confusing" language of the regulation. As support for this interpretation, petitioners point out that "every corporation has such passive, nonoperating, bookeeping-type [sic] assets *on the date of corporate formation,* namely organizational expense assets," and that under a literal reading of the regulation this would be sufficient to begin its first taxable year.[8]

We can find no support for petitioners' interpretation of the phrase "acquires assets." Indeed, as we view the regulation, a contrary interpretation is required. As pointed out above, the regulation postpones the need for an election while the corporation is merely a hollow

---

[7] Respondent does not contend that Enterprises' election was late because it had shareholders more than 1 month before the election was made. Nor do petitioners contend that there were no individuals who could give their consent as shareholders prior to the issuance of stock on Mar. 22, 1965. We note that the minutes of the meeting of the organizers held on Jan. 4, 1965, refer to both subscribers and shareholders. Cf. *Thos. E. Bone,* 52 T.C. 913, 920 (1969).

[8] In the absence of an election under sec. 248, organizational expenses, ordinarily de minimis for a small business corporation, cause no immediate tax consequences. Under that section, organizational expenses, upon an election by the corporation, may be deducted ratably "over such period of not less than 60 months as may be selected by the corporation (beginning with the month in which the corporation begins business)." The regulation amplifying sec. 248 (sec. 1.248–1(a)(3)) explains:

If the activities of the corporation have advanced to the extent necessary to establish the nature of its business operations, * * * it will be deemed to have begun business. For

shell. When Enterprises received the $20,000, incurred liability for interest on the loan, set up the two bank accounts, and made the remodeling expenditures, it was no longer dormant, and the need to postpone the election was no longer present. The standard employed in the regulation is clear. We think petitioners' interpretation of the regulation would merely muddy the waters by creating inevitable confusion as to what constitutes operating assets and what are passive, nonoperating assets.

However, even if we are to accept petitioners' argument that the cash derived from the loan was not an asset, we would be compelled to hold that the corporation acquired yet another asset prior to February 26, 1965. As mentioned in our Findings, Waller signed a 10-year lease on the premises on December 3, 1964, and petitioner paid $2,600 as rent under the lease. Quite obviously, Waller executed the lease as nominee for the corporation to be created.[9] In any event, on February 17, 1965, Waller assigned the lease to Enterprises, and prior to the crucial date of February 26, 1965, as detailed in our Findings, the corporation spent $7,293.78 to completely remodel the premises for restaurant-nightclub use.

Although Jamison, the lessor, did not formally consent to the assignment of the lease until February 27, 1965, the assignment between Waller and Enterprises was completed more than 1 month before the subchapter S election was made. As between Enterprises and Jamison, petitioners acknowledge that under California law the assignment without Jamison's consent did not ipso facto terminate the lease or render it void. Instead, Jamison could either declare a forfeiture of the lease or acknowledge the assignment. *Guerin* v. *Blair*, 33 Cal.2d 744, 204 P.2d 884 (1949). He did the latter, and there is no indication that Jamison ever had any reservations about consenting to the assignment.[10] We think Enterprises acquired the lease as one of its assets

---

example, the acquisition of operating assets which are necessary to the type of business contemplated may constitute the beginning of business.

Under this standard, the acquisition of the lease, the creation of the liquor license escrow, and the expenditure of over $7,000 on remodeling would fall within this regulation. This would begin the first month of the corporation's taxable year since these activities would mark when the corporation began "doing business," as that term is used in sec. 1.1372–2 (b)(1), Income Tax Regs.

[9] The inference that Waller was only a nominee is supported by the overall agreement between him and petitioner, petitioner's expenditure of $18,600 on the lease, liquor license, and leasehold improvements during December of 1964, as well as the Jan. 8, 1965, liquor license escrow arrangement. Cf. Cal. Bus. & Prof. Code sec. 24074 (West 1964), dealing with arrangements for the transfer of liquor licenses.

[10] Even if Jamison had refused to acknowledge the assignment, Enterprises could have still raised equitable defenses to prevent him from taking over the property—for example, petitioner, not Waller, made the $2,600 rental payment; Enterprises expended substantial amounts for the liquor license transfer; and Enterprises and petitioner incurred the remodeling expenses. *Schubert* v. *Lowe*, 193 Cal. 291, 223 Pac. 550 (1924). There is no indication in the record that these defenses would not have been sufficient to block such an attempt by Jamison.

prior to February 26, 1965—an asset essential to the operation of the business.

In addition to laying out the remodeling expenditures, Enterprises had acquired several other miscellaneous assets, including printed matter, licenses for the business other than the liquor license, and deposits on the utilities for the business. It had also incurred and paid expenses such as legal fees, the rent on Waller's automobile, and fees for the transfer and renewal of the liquor license. These items amounted to $2,631.68.

All of these transactions—the borrowing of the $20,000 and the resulting liability for interest on the loan, the lease and the payment of rent thereon, the payment of fees, the leasing of Waller's automobile, and other items—involved tax consequences which were required to be taken into account in computing the taxable income or loss of Enterprises for its first taxable year ended November 30, 1965. Petitioners' accountant admitted that they were reflected in the tax return for that period. We think it clear that they are the kind of events which begin the running of the period within which a new corporation must make the subchapter S election.

Significantly, also, Enterprises functioned as any other corporation prior to February 26, 1965, in other respects. As noted, the corporation held its first annual meeting of its organizers and adopted bylaws on January 4, 1965. In addition to maintaining bank accounts from which the disbursements of about $10,000 were made, it kept its accounting journals and records separate from those of petitioners. It also made the improvements to the leased premises, arranged financing, and, generally, directed its efforts toward the development of a profit-making capability. *Thos. E. Bone*, 52 T.C. 913, 919 (1969).

We are compelled to conclude that Enterprises acquired assets more than 1 month before the subchapter S election was made. It did not make the election within the time prescribed by section 1372(c) (1) or the implementing regulations. See *Joseph W. Feldman*, 47 T.C. 329, 333 (1966); *William Pestcoe*, 40 T.C. 195, 198 (1963); *Simons* v. *United States*, 208 F. Supp. 744, 746 (D.Conn. 1962). Accordingly, Enterprises was not an "electing" small business corporation during its taxable year ended November 30, 1965, and petitioners are not entitled to deduct the corporation's net operating loss in that year.

*Decision will be entered for the respondent.*