RALPH L. BRUTSCHE AND INGRID BRUTSCHE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

RUTH L. FARLEY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 6818-73, 6819-73. Filed March 2, 1976.

*Joseph A. Sommer,* for the petitioners.
*Vivian T. Martinez, Jr.,* for the respondent.

1044

OPINION

Petitioners' primary position is that Thunder Mountain was not an electing small business corporation and consequently any increase in its undistributed income for its fiscal year 1969 is not taxable to them for the calendar year 1969 but to the corporation. Petitioners stated the following bases for this position:

(1) Thunder Mountain had more than one class of stock since the loans to the corporation by Ralph were equity investments, and consequently it was ineligible to elect under section 1371(a) to be taxed as a small business corporation;

(2) Even if Thunder Mountain were eligible to elect to be taxed as a small business corporation, its election was not filed within a month of May 26, 1961, the beginning of its taxable year and therefore was ineffective; and

(3) The election was ineffective since the statement of shareholders' consent filed with it omitted the number of shares of stock of Thunder Mountain issued to each shareholder and the dates on which such shares were acquired.

Petitioners argue that they are not estopped from asserting the invalidity of the corporation's election as respondent did not rely on any representation made by the corporation to his detriment since at the time of the trial of this case all facts were disclosed and respondent could at that time have issued a notice of deficiency to the corporation for its fiscal year 1969, the only year for which any tax would be due from the corporation.

Petitioners contend that, if Thunder Mountain qualifies as an electing small business corporation, it did not receive any taxable income in its fiscal year 1969 from settlement of litigation with the bank and forgiveness of its indebtedness by the bank and other creditors. Petitioners argue that the corporation properly accrued claims aggregating $231,720 against the bank during its fiscal years 1965, 1966, 1967, and 1968 for losses it incurred during those years by virtue of the bank's discontinuing the extension of credit to the corporation during early 1965 and consequently did not receive any taxable income during its fiscal year 1969 when it received the cash proceeds in the amount of $162,500 pursuant to a settlement of its pending law suit against

the bank. In the alternative, petitioners argue that the net operating losses were not deductible in the fiscal years during which they arose since there was a reasonable prospect for their recovery from the bank, relying on *Louis Gale,* 41 T.C. 269 (1963). Petitioners argue that the recovery of the losses in its fiscal year 1969 did not result in income to the corporation since the recovery was offset by the expenses paid out of the settlement. Petitioners also contend that the corporation did not receive any taxable income from the forgiveness of its indebtedness by the bank in the amount of $161,189.77 and by its other creditors in the amount of $40,204.83 as its liabilities exceeded its assets (excluding the claim receivable of $231,730.22) before the discharge of its indebtedness to the bank and to its other creditors, and by $21,335.62 after the discharge of such indebtedness.

Petitioners contend that if the corporation received income for its fiscal year 1969 from the receipt of the cash of $162,500 in exchange for damages it incurred, its transfer of houses with a book value of $52,613.75 should be offset against the receipt and the remaining $109,886 should be excluded from the corporation's income for its fiscal year 1969 under the tax benefit rule since its net operating losses which were deducted for its prior years did not result in any tax benefit to the corporation or its shareholders.

Respondent contends that Thunder Mountain was an electing small business corporation and that it had undistributed income in the amount of $231,730.22 for its fiscal year 1969 from the settlement of litigation and cancellation of indebtedness by the bank and other creditors. In the alternative respondent contends that, if the book value of the corporation's assets is an accurate reflection of their fair market value, the corporation had undistributed income in the amount of $171,500 for its fiscal year 1969, having received gross income in the amount of $251,058.75 during such fiscal year consisting of the following:

| | | |
|---|---|---|
| Cash proceeds of settlement of litigation | | $162,500.00 |
| Insurance refund | | 8.12 |
| Debt forgiveness by the bank | $161,189.77 | |
| Debt forgiveness by creditors | 40,204.83 | |
| Less: houses transferred | (52,613.75) | |
| Net debt forgiven | $148,780.85 | |
| Net book worth 6/30/68 | (222,730.22) | |

| | |
|---|---|
| Cash settlement 8/68 _ _ _ _ _ _ _ _ _ _ _ _ | 162,500.00 |
| Net book worth before forgiveness _ _ _ _ | (60,230.22) |

Amount realized (net book worth) after
  forgiveness of debt _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _     88,550.63

Total gross income _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _   251,058.75

Respondent takes the position that Ralph and Phillip as shareholders of an electing small business corporation received additional taxable income during the calendar year 1969 in the amount of their proportionate share of the corporation's undistributed income for its fiscal year 1969, and that one-half of Phillip's proportionate share was taxable to Ruth by virtue of the community property laws of New Mexico. Respondent also contends that Ruth received taxable income for the calendar years 1968 and 1969 to the extent of her community property one-half interest in dividend distributions in the amounts of $11,000 and $1,186.91 that Thunder Mountain made to Phillip in these years. Respondent argues that under section 446(c) the corporation cannot properly accrue in its fiscal years 1965 through 1968 amounts equal to its net operating losses for such years as a claim receivable from the bank. Further, he contends that petitioners are estopped from asserting the invalidity of the corporation's election based on their own or the corporation's misrepresentation in the Form 2553 filed by the corporation and in the statement of the shareholders' consent filed by the corporation's shareholders. In any event respondent contends the corporation's election for its fiscal year beginning July 1, 1961, was valid since it was timely and properly made on June 26, 1961, since the corporation did not have shareholders, had not acquired assets, and had not begun doing business before May 26, 1961.

Section 1372(a)[4] provides that any small business corporation with an exception not relevant under the facts of this case may

----

[4] SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION.

(a) ELIGIBILITY.—Except as provided in subsection (f), any small business corporation may elect, in accordance with the provisions of this section, not to be subject to the taxes imposed by this chapter. Such election shall be valid only if all persons who are shareholders in such corporation—

  (1) on the first day of the first taxable year for which such election is effective, if such election is made on or before such first day, or

  (2) on the day on which the election is made, if the election is made after such first day,

consent to such election.

elect not to be subject to income tax. Under section 1371(a)[5] a small business corporation is defined in part as a corporation which does not have more than one class of stock. Petitioners contend that Thunder Mountain's purported election under section 1372(a) was not effective as the corporation had two classes of stock and therefore was ineligible under section 1371. Petitioners argue that Ralph had greater rights in the profits and assets of the corporation by his having loaned more capital to the corporation in proportion to his ownership interest than Phillip.[6] Respondent contends that Ralph's loans did not in fact constitute equity and, if they did, that these loans were not a second class of stock under section 1371. We agree with respondent. In this case it would be incumbent on petitioners to show that Ralph's advances to the corporation were in fact contributions to the corporation's capital. These advances were consistently treated as loans. It is apparent from Ralph's account with the corporation that repayments were regularly made at least through the corporate fiscal year ended June 30, 1966, and then in the corporate fiscal year 1969 after the settlement of the suit the account was paid in full. Until the discontinuance of the line of credit by the bank in 1965, the corporation had other sources for borrowed funds. The facts in this record do not support petitioners' contentions that Ralph's advances to the corporation were contributions to capital and not loans.

Even if Ralph's advances were considered to be contributions to capital, they were not stock within the meaning of section 1371 since the character of the common stock was not altered so that a disparity in the rights of the shareholders in their status as such was created. Under the facts here, Ralph's right in his capacity as a shareholder to vote, to manage the business, or to participate in the profits and appreciation of the corporation were not increased or changed by virtue of the loans he made to

---

[5] SEC. 1371. DEFINITIONS.

(a) SMALL BUSINESS CORPORATION.—For purposes of this subchapter, the term "small business corporation" means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) and which does not—

    (1) have more than 10 shareholders;

    (2) have as a shareholder a person (other than an estate) who is not an individual;

    (3) have a nonresident alien as a shareholder; and

    (4) have more than one class of stock.

[6] Petitioners do not argue that the incorrect information furnished on the Form 2553 with respect to the number of shares owned by the corporation's shareholders invalidated the corporation's election.

the corporation. His only acquired right was to be repaid the amount of the loans that he made in his capacity as the corporation's creditor. In *James L. Stinnett, Jr.,* 54 T.C. 221 (1970), this Court said at page 232:

where the instrument is a simple installment note, without any incidents commonly attributed to stock, it does not give rise to more than one class of stock within the meaning of section 1371 merely because the debt creates disproportionate rights among the stockholders to the assets of the corporation. * * *

As we pointed out in the *Stinnett* case, *supra,* loans that are considered a contribution to capital are not necessarily to be treated as a second class of stock under section 1371. While a shareholder's loan to an electing small business corporation which is not characterized as a contribution to capital may be regarded for some purposes as part of the shareholder's investment in the corporation, it may be an investment represented by his common stock ownership only. A shareholder loan to a small business corporation will constitute stock within the meaning of section 1371(a)(4) if under the facts of the particular case the instrument representing the loan possesses such characteristics as to be in the nature of stock under local law. See *Estate of William M. Allison,* 57 T.C. 174, 179 (1971).

Petitioners' reliance on *Henderson v. United States,* 245 F. Supp. 782 (M.D. Ala. 1965), is misplaced. The *Henderson* case is factually distinguishable. In that case the District Court held that under the facts there present the instruments received by the shareholder of a small business corporation for his advances to that corporation were in the nature of stock and therefore constituted a second class of stock under section 1371(a)(4) applying former section 1.1371-1(g), Income Tax Regs., which then provided in part that: "If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock." T.D. 6432, 1960-1 C.B. 317, 321.[7] A loan that is

---

[7] Sec. 1.1371-1(g), Income Tax Regs., which was promulgated by T.D. 6432, 1960-1 C.B. 317, 321, that was published in 24 Fed. Reg. 10294 on Dec. 19, 1959, provided as follows:

(g) *Classes of stock.*—A corporation having more than one class of stock does not qualify as a small business corporation. In determining whether a corporation has more than one class of stock, only stock which is issued and outstanding is considered. Therefore, treasury stock and unissued stock of a different class than that held by the shareholders will not disqualify a corporation under section 1371(a)(4). If the outstanding shares of stock of the corporation are not identical with respect to the rights and interest which they convey in the control, profits, and assets of the corporation, then the corporation is considered to have more than one class of stock. Thus, a difference as to voting rights, dividend rights, or

considered a contribution to capital does not necessarily constitute a second class of stock under section 1371(a)(4). *James L. Stinnett, Jr., supra.* See *Portage Plastics Co. v. United States,* 486 F. 2d 632 (7th Cir. 1973); *Amory Cotton Oil Co. v. United States,* 468 F. 2d 1046, 1051 (5th Cir. 1972); *Shores Realty Co. v. United States,* 468 F. 2d 572, 577-578 (5th Cir. 1972).

Petitioners rely on section 1.1371-1(g), Income Tax Regs., providing that "Obligations which purport to represent debt but which actually represent equity capital will generally constitute a

liquidation preferences of outstanding stock will disqualify a corporation. However, if two or more groups of shares are identical in every respect except that each group has the right to elect members of the board of directors in a number proportionate to the number of shares in each group, they are considered one class of stock. If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock.

Sec. 1.1371-1(g), Income Tax Regs., which was amended by T.D. 6904, 1967-1 C.B. 219, that was published in 31 Fed. Reg. 16527 on Dec. 28, 1966, provided as follows:

(g) *Classes of stock.* A corporation having more than one class of stock does not qualify as a small business corporation. In determining whether a corporation has more than one class of stock, only stock which is issued and outstanding is considered. Therefore, treasury stock and unissued stock of a different class than that held by the shareholders will not disqualify a corporation under section 1371(a)(4). If the outstanding shares of stock of the corporation are not identical with respect to the rights and interest which they convey in the control, profits, and assets of the corporation, then the corporation is considered to have more than one class of stock. Thus, a difference as to voting rights, dividend rights, or liquidation preferences of outstanding stock will disqualify a corporation. However, if two or more groups of shares are identical in every respect except that each group has the right to elect members of the board of directors in a number proportionate to the number of shares in each group, they are considered one class of stock. Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock. However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock. But, if an issuance, redemption, sale, or other transfer of nominal stock, or of purported debt obligations which actually represent equity capital, results in a change in a shareholder's proportionate share of nominal stock or his proportionate share of such purported debt, a new determination shall be made as to whether the corporation has more than one class of stock as of the time of such change.

Respondent issued a Technical Information Release No. 875 on Dec. 28, 1966, with respect to the amendment of sec. 1.1371-1(g), Income Tax Regs., which provided in part as follows:

"The Internal Revenue Service stated that, although it considered the original regulation to be a permissible application of existing law, it has modified the application of section 1371(a)(4) of the Code on the basis of experience with the statute. That experience has demonstrated that the requirement of the Code relating to one class of stock is, in effect, met as long as the owners of the equity capital in the corporation have no greater rights among themselves, as a result of purported debt obligations which actually represent equity capital, in the control, profits, and assets of the corporation than they would have as owners of the nominal stock of the corporation. In such cases, the rights and interests of each shareholder in the control and profits are proportionate to his rights and interests in the assets of the corporation.

"The Revenue Service said that the modified application of the one class of stock requirement will be followed in the disposition of all cases which are pending."

second class of stock." We have held this regulation invalid to the extent it might be interpreted to compel a determination that there is more than one class of stock under section 1371(a) where loans which are considered an equity investment but lack any rights usually attributed to stock ownership are made by shareholders in disproportion to their ownership. *James L. Stinnett, Jr., supra* at 230. Petitioners argue that regardless of any holding with respect to this regulation, respondent is bound by it until he revokes it. Had petitioners relied on this regulation or its predecessor in planning a business transaction, there might be some validity to this contention. However, we do not have to decide the issue in this case since the factual situation here does not support petitioners' contention. Until the commencement of the trial of this case petitioners had treated Thunder Mountain as a small business corporation. However, regardless of the validity of this argument of petitioners, as we have heretofore pointed out, Thunder Mountain did not have a "second class of stock" because of Ralph's loans being in fact debt.

Section 1372(c)(1)[8] provides that an election by a small business corporation may be made for any taxable year at any time during the first month of such taxable year, or at any time during the month preceding such first month. To be effective such election must be timely. *Joseph W. Feldman,* 47 T.C. 329, 333 (1966); *William Pestcoe,* 40 T.C. 195, 198 (1963).

Section 1.1372-2(b)(1), Income Tax Regs.,[9] provides that in the case of a new corporation "the first month of the taxable year of a new corporation does not begin until the corporation has shareholders or acquires assets or begins doing business,

[8] SEC. 1372. ELECTION BY SMALL BUSINESS CORPORATION.
(c) WHERE AND HOW MADE.—
    (1) IN GENERAL.—An election under subsection (a) may be made by a small business corporation for any taxable year at any time during the first month of such taxable year, or at any time during the month preceding such first month. Such election shall be made in such manner as the Secretary or his delegate shall prescribe by regulations.
[9] Sec. 1.1372-2(b)(1), Income Tax Regs., provides as follows:
    (b) *Time of making election—*(1) *Taxable years beginning on or after September 3, 1958.* For taxable years beginning on or after September 3, 1958, the election shall be filed either (i) during the first month of such taxable year, or (ii) during the month preceding such first month. In the case of a new corporation whose taxable year begins after the first day of a particular month, the term "month" means the period commencing with the beginning of the first day of the taxable year and ending with the close of the day preceding the numerically corresponding day of the succeeding calendar month or, if there is no such corresponding day, with the close of the last day of such succeeding calendar month. For purposes of this subparagraph, the first month of the taxable year of a new corporation does not begin until the corporation has shareholders or acquires assets or begins doing business, whichever is the first to occur.

whichever is the first to occur." Petitioners' position is that Thunder Mountain's election was not timely. They contend June 26, 1961, the date of the filing of the election, was subsequent to the last day of the period prescribed under section 1.1372-2(b)(1), Income Tax Regs., for a new corporation to elect, since Thunder Mountain had shareholders, had acquired assets, and had begun doing business no later than May 26, 1961. Respondent contends that the corporation's election was timely since no stock certificates had been issued, no assets acquired, and no business begun until sometime after May 26 and on or before July 1, 1961.

The corporation's election was filed on June 26, 1961.[10] The initial issue then is whether the corporation's election filed on June 26, 1961, was made within the first month of its taxable year which for a new corporation, pursuant to respondent's regulations, does not begin until after a corporation has shareholders, acquires assets, or begins doing business. *Nick A. Artukovich*, 61 T.C. 100, 105-106 (1973). We conclude that Thunder Mountain did not make its election within the first month of its taxable year as defined by respondent's regulations since June 26, 1961, when its election was filed was more than a month[11] after May 1, 1961, the date as of which the stock certificates had been issued to the corporation's shareholders and

---

[10] The parties stipulated that "On June 26, 1961, Thunder Mountain Land Company, Inc. filed its election under Int. Rev. Code of 1954, §1372." We note that if, as the parties at times appear to assume, June 25, 1961, was the last date for Thunder Mountain to file its election, under the facts here the stipulated date of the filing of the election would be an incorrect legal conclusion since Form 2553 was mailed on June 24, 1961. See sec. 7502; *Joseph W. Feldman*, 47 T.C. 329, 332-333 (1966). However, since we have found the corporation had shareholders by May 1, 1961, an election filed June 24, 1961, would have been untimely, see *Nick A. Artukovich*, 61 T.C. 100 (1973), for Thunder Mountain's first year of existence.

[11] Sec. 1372(c) provides for a corporation to make its election during the "month" before or after the beginning of any taxable year. Sec. 1.1372-2(b)(1), Income Tax Regs., provides that in the case of a new corporation whose taxable year begins after the first day of a particular month, the term "month" means the period commencing with such first day and ending with the day preceding the numerically corresponding day of the succeeding calendar month or, if none, the last day of such succeeding calendar month and that the first month of a taxable year of a new corporation does not begin until the corporation has shareholders, or acquires assets, or begins doing business.

Since the beginning of a new corporation's taxable year in the middle of the month may not coincide with its having shareholders, or acquiring assets, or beginning business, respondent's regulations are ambiguous with respect of determining the period for which a new corporation may elect. We construe them to mean that a new corporation may make its election during the period commencing with the date it has shareholders, acquires assets, or begins doing business and ending on the day preceding the numerically corresponding day of the succeeding calendar month or, if none, the last day of such succeeding calendar month.

after May 26, 1961, the date the corporation acquired assets by purchasing land and liabilities by obligating itself to purchase additional land. However, this conclusion is not dispositive of the issue of the timeliness of the corporation's election.

Section 1372(c)(1) specifically provides that an election may be made by a small business corporation "for *any taxable year*" during the month preceding the first month of the taxable year. Section 441(b)(1) and (c) define "taxable year" as the annual period, either a calendar year or a fiscal year, on the basis of which the taxpayer regularly computes its income and keeps its books. See also sec. 7701(a)(23); sec. 1.441-1(a), Income Tax Regs. Thunder Mountain came into legal existence on the date of its incorporation on March 29, 1961, *Ajax Engineering Corp.,* 17 T.C. 87, 91 (1951), affd. per curiam 196 F. 2d 727 (3d Cir. 1952), and sometime thereafter adopted a fiscal year ending June 30 as the annual accounting period for which it computed its income. It filed a small business corporation tax return, on which the notation "first return" was shown, for the fiscal year July 1, 1961, to June 30, 1962. It kept its accounting records on the basis of a fiscal year ending June 30. The record in this case does not show whether Thunder Mountain on its incorporation adopted an accounting period of the fiscal year ended June 30 or changed with respondent's approval to this period, after having adopted a calendar year accounting period upon its incorporation or, not having had any accounting period, being treated as having had a calendar year accounting period. Secs. 441(b)(3), 441(g), 442, 443(a)(1) and (2). *Calhoun v. United States,* 370 F. Supp. 434 (W.D. Va. 1973).

Even though the record is inadequate to determine how Thunder Mountain adopted a fiscal year ending June 30, the record is clear it did use such a fiscal year in keeping its books and filing its Federal income tax returns. Therefore, the first year of the corporation was the short taxable year ending June 30, 1961. Even though the corporation apparently filed no Federal tax return for the short taxable year, it was in fact in existence and had some business transactions in this period.[12] Therefore, the corporation had a taxable year beginning on July 1, 1961, and

[12] See sec. 1.6012-2(a), Income Tax Regs., which requires that a return be filed by a corporation in existence during any portion of a taxable year except "If a corporation has received a charter but has never perfected its organization and has transacted no business and has no income from any source" it may be relieved of filing a return by the district director upon a proper showing.

ending on June 30, 1962, which was in fact its second taxable year even though it was its first full fiscal year. On the basis of the record in this case, we conclude that the election filed by the corporation on June 26, 1961, at which time it had assets and shareholders, *J. William Frentz,* 44 T.C. 485, 488-490 (1965), affd. 375 F. 2d 662 (6th Cir. 1967), was timely with respect of its taxable year beginning July 1, 1961, and ending June 30, 1962. Cf. *Thos. E. Bone,* 52 T.C. 913 (1969).

Petitioners' next contention is that the corporation's election was not effective since the required statement of shareholders' consent omitted the number of shares of stock owned by each shareholder and the date on which such shares were acquired by each such stockholder in contravention of section 1.1372-1(a) as amplified by section 1.1372-3(a) of respondent's regulations.[13]

---

[13] Sec. 1.1372-1 [Income Tax Regs.] Election by small business corporation.

(a) *Eligibility.* Under section 1372, an eligible small business corporation may elect not to be subject to the taxes imposed by chapter 1 of the Code (other than the tax imposed by section 1378 for taxable years beginning after April 14, 1966). The qualifications of a small business corporation must be met as of the first day of the first taxable year of the corporation for which the election is to be effective and on the date of election, unless the election is made after such first day, in which case the qualifications need not exist prior to the date of election. For example, the existence of a corporate shareholder or a nonresident alien as a shareholder prior to the date of election does not preclude qualification. However, if the election is made for a taxable year beginning before September 3, 1958, the qualifications must be met on such date and on each day after such date and before the date of election. The election by a small business corporation is valid only if all the shareholders in the corporation on the first day of the first taxable year for which the election is to be effective, or on the date of election, whichever is later, consent to such election. See § 1.1372-3, relating to shareholders' consent.

Sec. 1.1372-3 [Income Tax Regs.] Shareholders' consent.

(a) *In general.* The consent of a shareholder to an election by a small business corporation shall be in the form of a statement signed by the shareholder in which such shareholder consents to the election of the corporation. Such shareholder's consent is binding and may not be withdrawn after a valid election is made by the corporation. Each person who is a shareholder of the electing corporation must consent to the election; thus, where stock of the corporation is owned by a husband and wife as community property (or the income from which is community property), or is owned by tenants in common, joint tenants, or tenants by the entirety, each person having a community interest in such stock and each tenant in common, joint tenant, and tenant by the entirety must consent to the election. The consent of a minor shall be made by the minor or by his legal guardian, or his natural guardian if no legal guardian has been appointed. The consent of an estate shall be made by the executor or administrator thereof. The statement shall set forth the name and address of the corporation and of the shareholder, the number of shares of stock owned by him, and the date (or dates) on which such stock was acquired. The consents of all shareholders may be incorporated in one statement. The consents of all persons who are shareholders at the time the election is made shall be attached to the election of the corporation. If the election is made before the first day of the corporation's taxable year for which it is effective, the consents of persons who become shareholders after the date of election and are shareholders on such first day shall be filed with the internal revenue officer with whom the election was filed as soon as practicable after such first day. The consent referred to in the preceding sentence will be considered timely if it is filed on or before the last day prescribed for making the election. Where a consent is filed after the

Respondent contends that petitioners are estopped from asserting a different number of shares than are shown on the Form 2553 filed with their consent and that in any event they complied with respondent's regulations by furnishing the number of shares as of September 28, 1961, the last day of an extended period granted for filing by respondent's District Director's office.

Section 1372(a) in part provides that an election of a small business corporation shall be valid only if all persons who are shareholders in such corporation on the first day of the first taxable year for which such election is effective, if such election is made on or before such first day, consent to such election.

---

date of election, a copy of the consent shall also be filed with the return required to be filed under section 6037. In the case of a shareholder in a community-property State whose spouse has filed a timely consent to an election under section 1372(a) for a taxable year beginning before January 1, 1961, the time for filing the consent of such shareholder shall not expire prior to May 15, 1961; in the case of a shareholder in a community-property State whose spouse has filed a timely consent to an election under section 1372(a) for a taxable year beginning after December 31, 1960, and on or before October 26, 1962, the consent of such shareholder shall be considered timely if it is filed on or before the last day prescribed for making the election. An election under section 1372(a) will not be valid if any of the consents are not timely filed. However, see paragraph (c) of this section for extension of time for filing consents. In addition, an election which was timely filed for any taxable year beginning before March 1, 1960, and which would be valid but for the fact that the consent of any shareholder of the corporation was not filed or was defective in any manner, will not be invalid if—

(1) A proper consent is filed by such shareholder after December 19, 1959, and on or before March 1, 1960.

(2) All shareholders of the corporation who previously filed timely and proper consents file new consents within the period mentioned in subparagraph (1) of this paragraph, and

(3) The shareholders show to the satisfaction of the district director with whom the election under section 1372(a) was filed that the failure to file timely and proper consents was not due to an intention to avoid making a valid election.
\* \* \*

(c) *Extension of time for filing consents.* An election which is timely filed for any taxable year and which would be valid, or would not have terminated, except for the failure of any shareholder to file a consent within the time prescribed in paragraph (a) or (b) of this section will not be invalid, or will not be treated as having terminated, for such reason if—

(1) It is shown to the satisfaction of the district director or director of the service center that there was reasonable cause for the failure to file such consent and that the interests of the Government will not be jeopardized by treating such election as valid, or as not having terminated,

(2) Such shareholder files a proper consent to the election within such extended period of time as may be granted by the Internal Revenue Service, and

(3) New consents are filed within such extended period of time as may be granted by the Internal Revenue Service, by all persons who were shareholders of the corporation at any time during the taxable year with respect to which the failure to consent would (but for the provisions of this paragraph) cause the corporation's election to be invalid or to terminate, and by all persons who were shareholders of the corporation subsequent to such taxable year and prior to the date on which an extension of time is granted in accordance with this paragraph.

Section 1.1372-3(a) of respondent's regulations provides for the manner of the filing of the consent of each shareholder of the corporation to the election by the corporation. This regulation provides that the consents must be timely filed and that the consent shall be in the form of a statement signed by the shareholder in which such shareholder consents to the election of the corporation. Further it provides: "The statement shall set forth the name and address of the corporation and of the shareholder, the number of shares of stock owned by him, and the date (or dates) on which such stock was acquired." Sec. 1.1372-3(a), Income Tax Regs. However, the failure of any shareholder to file a timely consent will not be fatal to a timely election of a small business corporation if such shareholder files a proper consent and new consents are filed by all shareholders within such extended period of time as may be granted by the Internal Revenue Service. Sec. 1.1372-3(c), Income Tax Regs., which was promulgated on Mar. 4, 1964, by T.D. 6707, 1964-1 C.B. (Part 1) 315. This regulation is applicable to the corporation's fiscal year ending June 30, 1961, and subsequent years. See *Dixon v. United States,* 381 U.S. 68 (1965). Consequently for Thunder Mountain's election to be valid and effective for its taxable year ending June 30, 1962, and subsequent years, its shareholders had to timely consent in the appropriate manner to its election on or before July 1, 1961, or within that period of time that was granted by respondent. As petitioners recognize, this record contains no direct evidence that any later consent was or was not filed by the stockholders showing the number of shares owned by each and the dates of acquisition of those shares. The inference is that such a later consent was filed since a copy but not the original of the letter extending the time for the information to be filed was in Ralph's records. However, respondent's determination that Thunder Mountain was an electing small business corporation is presumptively correct and petitioners have the burden to show that the corporation's shareholders did not properly file consents to the corporation's election if they rely on this fact to show that the corporation's election was invalid. Rule 142, Tax Court Rules of Practice and Procedure. We, therefore, conclude that the election of Thunder Mountain to be a small business corporation was valid.

In view of our holding that Thunder Mountain made a valid election to be a small business corporation, it is unnecessary for us to decide whether respondent's contention that petitioners are estopped from asserting the invalidity of Thunder Mountain's election is valid.

Petitioners contend that the corporation as reflected by its amended returns properly accrued claims receivable from the bank as an item of gross income in the amounts of $125,777, $59,685, $27,497, and $18,771 for its taxable years ended June 30, 1965, 1966, 1967, and 1968, respectively. In the alternative, petitioners contend that the corporation's net operating losses in the amounts of $125,777, $59,685, $27,497, and $18,771 which were attributable to its taxable years ending June 30, 1965, 1966, 1967, and 1968, respectively, were not deductible in such taxable years, since such losses were in the nature of casualty losses under section 165 with respect to which there was a reasonable prospect of recovery. Petitioners argue that the aggregate amount of such losses was deductible for its taxable year ending June 30, 1969. In either event petitioners conclude that the corporation realized no income in 1969 from the settlement of its litigation with the bank.

Respondent contends that the claims receivable may not be properly accrued for the corporation's taxable years ending June 30, 1965, 1966, 1967, and 1968. He also contends that the corporation's net operating losses are deductible with respect of the taxable year in which they arose since such losses are not in the nature of casualty losses and that the shareholders of the corporation to the extent allowable under section 1374 were each allowed to deduct his share of the corporation's net operating losses.

Petitioners recognize that any amount the corporation received from the bank in settlement of the lawsuit against the bank was an item of gross income to the corporation rather than a recovery of capital and that the income was ordinary income. It is well settled that when a claim is settled, the amount received takes the character of the item that gave rise to the claim. Thunder Mountain's claim against the bank was founded on its loss of its anticipated profits. Since these profits would have been ordinary income if the corporation had received them in the first instance, the amount received in settlement of the claim for these profits is ordinary income. The issue here is not the nature of the

receipts but is the taxable year for which the corporation received the income.

An accrual basis taxpayer [14] must include an item in gross income for the taxable year in which all events have occurred that fix the right to receive such income and the amount thereof with reasonable accuracy. Sec. 1.451-1(a), Income Tax Regs. Whether an item is properly accruable is a factual question. On the basis of this record, we conclude that the corporation was not entitled to receive from the bank an amount equal to the amount of its net operating loss for each of its taxable years 1965 through 1968 during each such year and hold that the corporation was not entitled to accrue any amount as income because of its claim against the bank prior to its taxable year ended June 30, 1969. In its fiscal year 1969, Thunder Mountain actually received the proceeds from the settlement of its lawsuit against the bank. Prior to the close of its taxable year ending June 30, 1965, there is no evidence that the corporation had asserted any claim against the bank and after the corporation had filed suit against the bank during July 1965 the corporation's right to recovery remained uncertain until the lawsuit was dismissed in August 1968. The bank contested the lawsuit and its alleged liability under the agreement to extend credit to the corporation. The compromise was reached in August 1968 after witnesses had been deposed and apparently sufficient evidence disclosed to convince the representatives of the bank that it was to the bank's interest to settle the lawsuit. All events had not occurred prior to the corporation's fiscal year 1969 to fix its right to recover from the bank for its lost profits and there was no basis of ascertaining with reasonable accuracy the amount of any contingent right of the corporation to recover from the bank prior to the settlement in August 1968. The amount of damages claimed by the corporation in its complaint filed in July 1965 was greatly in excess of the amount of its net operating loss for its taxable year 1965 and for that and all subsequent taxable years prior to the settlement. See *Swastika Oil & Gas Co. v. Commissioner*, 123 F. 2d 382 (6th Cir. 1941), affg. 40 B.T.A. 798 (1939).

Petitioners' reliance on *Continental Tie & Lumber Co. v. United States*, 286 U.S. 290 (1932), and related cases is

---

[14] Both parties argue on the assumption that Thunder Mountain filed its tax returns on an accrual basis and the returns are filed in such a way as to indicate that this assumption is correct.

misplaced. The *Continental* case and related cases are factually distinguishable from the instant case. In *Continental* the accrual basis taxpayer's right to payment ripened under the facts and circumstances of that case prior to the actual payment and at the time that such right arose the sum of money that right represented was ascertainable with reasonable accuracy.

An accrual basis taxpayer may deduct an expense for the taxable year in which all events necessary to determine both the fact and the amount of the liability have occurred. Sec. 1.461-1(a)(2), Income Tax Regs.; *United States v. Anderson,* 269 U.S. 422 (1926). Petitioners do not contend that the corporation did not satisfy the all-events test with respect of expenses that it deducted for its taxable years 1965 through 1968 and we conclude that its expenses are deductible for such taxable years. However, petitioners argue that, if we conclude the corporation may not properly accrue a claim against the bank prior to its fiscal year 1969, the corporation incurred a loss during each of its taxable years 1965 through 1968 in the amount equal to its net operating loss for each such year. Petitioners contend that under section 165 such losses were not deductible by the corporation during the taxable year in which they were incurred as they were not in fact sustained during such years since there was at that time a reasonable prospect of their recovery from the bank. Petitioners rely on *Louis Gale,* 41 T.C. 269 (1963). Respondent contends that a net operating loss is not a loss for which section 165 allows a deduction. We agree with respondent. Such a loss is the result of deductions exceeding income and is not the type of loss to which section 165 refers. In effect, petitioners' argument is that the corporation sustained a loss in the amount of profit it failed to realize because of the withdrawal of the bank's credit and that this loss was sustained in 1969 only.

Section 165(a) permits a deduction for any loss sustained during the taxable year and not compensated for by insurance or otherwise. Plainly, section 165(a) does not allow a deduction for the amount of income that a taxpayer failed to realize. See *Hort v. Commissioner,* 313 U.S. 28 (1941). There is no evidence in this record of any losses within the meaning of section 165 incurred by Thunder Mountain during its taxable years 1965 through 1968 that under the rationale of the *Gale* case, *supra,* might be considered as having been sustained during its taxable year 1969. We conclude that Thunder Mountain is not entitled

under section 165 to a deduction of a loss for its taxable year 1969 in an amount equal to the aggregate amount of its net operating losses for its taxable years 1965 through 1968.

Petitioners contend that the corporation received no income during its taxable year 1969 from the forgiveness of indebtedness by its creditors in the amount of $40,204.83 and by the bank in the amount of $161,189.77. Petitioners argue that the corporation realized no economic gain from the forgiveness of indebtedness since it was insolvent before and after such forgiveness. Petitioners rely on such cases as *Commissioner v. Simmons Gin Co.,* 43 F. 2d 327 (10th Cir. 1930), affg. 16 B.T.A. 793 (1929). Respondent contends that the corporation received income from forgiveness of its indebtedness and from settlement of litigation in the amount of $311,380.85, representing the cash amount of $162,500 received from the bank, plus the amount of $161,189.77 of indebtedness canceled by the bank and the $40,203.83 of indebtedness canceled by other creditors, offset by the transfer of houses to the bank with a cost basis of $52,613.75 to the corporation.

In the alternative respondent contends that, if we find the value of the corporation's assets have been established, the corporation received income from the forgiveness of its indebtedness and settlement of litigation in the amount of $251,050.63, consisting of the amount of $162,500 cash received from the bank and the amount of $88,550.63 representing the net solvency of the corporation after its receipt of the cash proceeds, the cancellation of its indebtednesses, and the transfer of its houses.

On brief respondent argues that the corporation's balance sheet did not accurately reflect the fair market value of the corporation's assets and liabilities before the cancellation of its indebtednesses. However, respondent conceded at the trial of this case that he had no disagreement with the amounts shown on the balance sheet as representing the value of the corporation's assets and liabilities prior to the cancellation of the corporation's indebtednesses and settlement of the litigation and that the corporation had liabilities, exclusive of any amount for its shareholders' paid-in capital, in excess of assets, exclusive of the accrued claim against the bank, to the extent of $222,730.22. Petitioners agree that, if we concluded the corporation could not properly accrue a claim for damages against the bank,

$222,730.22 was the amount by which its liabilities exceeded its assets prior to the settlement of its suit against the bank. It is apparent from the record in this case that the corporation was insolvent to the approximate extent of $222,730.22 before the settlement of its litigation with the bank and the cancellation of the corporation's indebtednesses.[15]

It is well settled that gross income includes income from the discharge of indebtedness. Sec. 61(a)(12); sec. 1.61-12(a), Income Tax Regs. However, income is not realized by a taxpayer by a forgiveness of indebtedness by its creditors if immediately thereafter the taxpayer's liabilities exceed the value of its assets. Sec. 1.61-12(b)(1), Income Tax Regs.

This Court stated in *Texas Gas Distributing Co.,* 3 T.C. 57, 61-62 (1944), as follows:

> The principles enunciated by these cases are these: Where an insolvent debtor turns over all or part of his property to his creditors in full or partial satisfaction of his debts, if the debtor remains insolvent he realizes no taxable gain. On the other hand, where an insolvent debtor, by reason of the transaction in question, becomes solvent he realizes taxable gain in the amount of the assets freed from the claims of creditors, i.e., to the extent by which the transaction renders him solvent.

See *Yale Avenue Corp.,* 58 T.C. 1062, 1072-1073 (1972).

The cancellation by the corporation's creditors and the bank of its indebtednesses, the transfer of houses, and the payment of cash proceeds were interdependent. Each was a part of an overall integrated arrangement. After the overall arrangement was completed, the corporation had assets in excess of its liabilities, other than the shareholders' paid-in capital, in the amount of $88,550.63.

Petitioners argue that the corporation did not realize any income from the cancellation of its indebtednesses since it remained insolvent after the cancellation, but concede that by virtue of the cash proceeds it received, the corporation realized income to the extent of its net worth after the completion of the

---

[15] Respondent does not contend that Ralph's loans in the amount of $31,056.06 as of June 30, 1968, were in fact contributions to the corporation's capital. His notice of deficiency treats such loans as bona fide indebtedness and as his determination is presumptively correct, we consider these loans to in fact be loans. We do not consider petitioners' argument with respect to Ralph's advances to the corporation being considered as contributions to its capital for purposes of constituting a second class of stock under sec. 1371 to be a concession with respect of such amounts constituting a contribution to capital for all purposes. In any event we held petitioners' contention in this respect not to be established by the record.

overall transaction or, in the alternative, in the amount of $109,886.25 which it states is the net amount it received for its lost profits, the cash amount of $162,500 having been offset by the cost of the homes transferred. Respondent argues that the corporation realized income in the amount of $88,550.63 upon the cancellation of its debts which he computes as having been offset by the cost of the homes transferred. He argues that the corporation realized income in the additional amount of $162,000 from the settlement of the litigation for lost profits.

We conclude that the corporation realized income in the amount of $162,500 as such amount was received in settlement of a claim for lost profits.[16] Amounts that are in substitution of an amount which would have been an item of income are income. *Raytheon Production Corp. v. Commissioner,* 144 F. 2d 110 (1st Cir. 1944), affg. 1 T.C. 952 (1943). We do not accept petitioners' contention that the corporation received only the amount of $109,886.25 for lost profits since there is no evidence that the houses were transferred for any portion of the payment of the cash amount of $162,500 to the corporation. There is nothing in this record to indicate that the houses were not transferred in satisfaction of the bank's dismissal of its counterclaim and the cancellation by the bank of the corporation's indebtedness to it for outstanding construction loans.[17]

---

[16] The corporation's complaint sought in part damages for dissipation of its goodwill. However, petitioners do not contend that the cash proceeds were in fact compensation for its goodwill.

[17] The evidence in this regard consists of the following stipulations:

"The bank filed a counterclaim for $161,189.77, which was the balance owed (representing construction loans) to the bank by the corporation at the time of the law suit.

"On August 13, 1968, a settlement of the law suit was reached and the corporation's complaint dismissed with prejudice and the bank's counterclaim for $161,189.77 was dismissed with prejudice. Simultaneously, the corporation transferred to the bank two houses and two triplexes, having a basis to the corporation of $52,013.75, and was paid by the bank the sum of $162,500.00 in cash."

From these stipulations and the balance sheets of Thunder Mountain, it is clear that the corporation did not deny its indebtedness of $161,189.77 to the bank but merely did not pay that indebtedness either because of its pending suit or because of lack of funds. On the basis of the facts here it might be concluded that the bank paid to Thunder Mountain $271,076.02 for lost profits ($162,500 + $161,189.77 = $323,689.77 − $52,613.75 = $271,076.02) since the dropping of the counterclaim for an indebtedness which was not challenged except for an allegation that the bank owed the corporation more than that amount for lost profits was in effect a payment by the corporation of the debt and a payment by the bank to the corporation of the same amount as lost profits. However, since respondent makes no such contention but in effect concedes that the dropping of the counterclaim for transfer of the houses was a forgiveness of indebtedness of $108,576.02, we have accepted respondent's position in this regard.

The corporation was clearly insolvent before the bank forgave the corporation's indebtedness to it. The more difficult question is whether the corporation was solvent after the forgiveness and if so the amount of such solvency. This turns on whether the amount of cash proceeds received in settlement of the damages for lost profits sustained by the corporation is treated as an asset of the corporation in determining its net solvency after the cancellation of its indebtedness. Inasmuch as the parties have stipulated that on August 13, 1968, the lawsuit was dismissed and simultaneously the corporation transferred its houses to the bank and was paid by the bank the amount of $162,500, we find that the cash proceeds were not received after the cancellation of the corporation's indebtedness to the bank, but at the same time. There is no evidence to the contrary. Therefore, such amount is properly includable as an asset of the corporation in the determination of the corporation's net worth immediately following the cancellation of its indebtedness to the bank. It follows from this conclusion that the corporation was solvent to the extent of $48,345.80 after the bank's compromise of its loans to the corporation and the corporation's transfer of the houses to the bank. We conclude on the basis of the facts presented in this record that the corporation realized the amount of $48,345.80 from the cancellation of its indebtedness to the bank as the corporation was rendered solvent to that extent after the completion of the transaction that canceled its indebtedness to the bank. See *Lakeland Grocery Co.,* 36 B.T.A. 289 (1937). The corporation's creditors agreed to accept the amount of $47,164.04 in lieu of their claims in the amount of $87,368.87. The record indicates that the creditors forgave their claims at the time they were paid since they settled their claims on the understanding that they would receive the reduced amount out of the settlement proceeds. The corporation was solvent as of and after the settlement of the litigation with the bank and the payment of the cash proceeds to the corporation. Consequently, we conclude that the corporation realized the amount of $40,204.83 from the cancellation of its indebtedness to its creditors. We, therefore, reach the same $88,550.63 amount of income to the corporation from cancellation of indebtedness as respondent did in his computation with respect to the corporation's solvency even though we arrive at the amount in two steps.

Petitioners argue that under section 111 and respondent's regulations thereunder the corporation is not required to include in its gross income for its fiscal year 1969 any amount that it recovered that year which was attributable to its deductions from gross income for its fiscal years 1965, 1966, 1967, and 1968 since it did not receive any tax benefit from the deductions for such years. Initially, we note that an electing small business corporation may not receive a tax benefit under any circumstances as it is not subject to income tax. Such corporation's shareholders derive the tax benefit from any deductions by the corporation as such deductions reduce their pro rata share of the corporation's undistributed income or the corporate losses are passed through to them to the extent allowable under section 1374. Ralph and his wife are entitled to deduct to the extent allowable under section 1374 their share of the corporation's net operating loss during its fiscal year 1965 for their calendar years 1962, 1963, 1964, and 1965, and their share of the corporation's net operating losses during its fiscal years 1967 and 1968 for their calendar years 1967 and 1968, respectively. The record shows that Ralph and his wife have claimed these deductions and they have been allowed by respondent. The record is unclear whether Phillip and Ruth have likewise claimed and been allowed any deductions for the corporation's losses or whether in fact under section 1374 they would be entitled to any such deductions. The tax benefit of the corporation's shareholders from the amount of the corporation's net operating losses that passed through to them is limited by the provisions of section 1374. However, even if we assume that the tax benefit rule is applicable to the shareholders of the corporation for amounts recovered by the corporation, which we do not, we would nevertheless conclude that neither the corporation nor its shareholders are entitled under section 111 or the tax benefit theory under case law to exclude any amount of income realized by the corporation from the cancellation of the corporation's indebtedness and settlement of litigation since there is no showing that there has been a recovery of the same item that was deducted in the prior years. Under the facts here, there was no recovery of the items deducted as such. The record does not show that the debts canceled or the cash proceeds of the settlement represented a recovery of expenses deducted in prior years. Even though the losses sustained by the corporation have been stipulated to have

resulted from the cutoff of bank credit, this record does not show such an interrelationship between the event constituting the expense and the event constituting its recovery to make the tax benefit rule apply.

A net operating loss results from an excess of deductions over adjusted gross income. It is not a loss that results from an expense but a loss that results from the proportionate amounts of gross income and deductions. Here the suit which was settled involved a claim for loss of income that Thunder Mountain had sustained by the withdrawal of the bank's credit. The effect of the withdrawal was to reduce Thunder Mountain's anticipated gross income to a proportionately greater extent than its expenses and such reduction resulted in its having an excess of deductions representing its expenses over income for its fiscal year ending June 30, 1965, and subsequent years.[18] The overall settlement and payment of $162,500 to Thunder Mountain by the bank in settlement of claims for lost profits based on the amounts of its net operating losses were plainly not attributable to its actual expenses, either singularly or in the aggregate, that it claimed as deductions in its returns for 1965 and subsequent years.

This Court stated in *Capitol Coal Corp.,* 26 T.C. 1183, 1197 (1956), affd. 250 F. 2d 361 (2d Cir. 1957), as follows:

We are unable to find a common denominator between any item sold by the petitioner at a loss in the earlier year and then involved in a gain in the subsequent year. We conclude that the facts of this case do not bring it within the tax benefit doctrine as expanded by *Dobson v. Commissioner, supra.*

Cf. *Estate of David B. Munter,* 63 T.C. 663 (1975).

The record shows that Thunder Mountain distributed from its available earnings the amounts of $11,000 and $1,186.91 during the calendar years 1968 and 1969, respectively, to Phillip. Under local law, these distributions were presumptively community property, N. M. Stat. Ann. sec. 57-4A-6 (1973), and Ruth had a present vested one-half undivided interest therein. *Hernandez v. Becker,* 54 F. 2d 542 (10th Cir. 1931). We, therefore, hold that

[18] With respect of its fiscal year ended June 30, 1965, Thunder Mountain reported a net operating loss of $125,776.84. It received income in the amount of $57,389.33 which was composed of gross receipts of $69,615.81 and rent of $2,642.24, that was adjusted for a loss of $14,868.72 from the sale of land. It claimed deductions in the amount of $183,166.17 which was composed of amounts paid for compensation of officers of the corporation of $27,040; taxes of $6,829.81; interest of $29,519.66; depreciation of $6,118.50, and miscellaneous expenses of $113,658.20, which included the costs of building permits, insurance, freight, accounting, advertising, commissions, legal counsel, equipment rentals, repairs, telephone, tools, office supplies, etc.

Ruth must include an amount representing her interest in the distributions made to her husband during the calendar years 1968 and 1969 in her gross income for such calendar years.

We hold that Thunder Mountain was an electing small business corporation and that under section 1373 petitioners Ralph and his wife, and petitioner Ruth, by virtue of their being shareholders of Thunder Mountain under local community property law, must include in gross income for the calendar year 1969 their pro rata share of the amount of Thunder Mountain's undistributed income for its fiscal year 1969.

*Decisions will be entered under Rule 155.*