T.C. Memo. 1997-121

UNITED STATES TAX COURT

I.C. HEMMINGS AND SUE B. HEMMINGS, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 41407-85, 14270-86,        Filed March 10, 1997.
              14273-86,  9710-90.

Lawrence William Sherlock and Robert I. White, for

petitioners.

    Bruce Leonard Locke, for petitioner Sue B. Hemmings.

    John P. Jankowski and Joseph T. Ferrick, for respondent.

---

    [1]  Cases of the following petitioners are consolidated
herewith:  Claude P. Brown and Estate of Mary Stroud Brown,
Deceased, Claude P. Brown, Executor, docket No. 14270-86; I.C.
Hemmings and Sue B. Hemmings, docket No. 14273-86; Isaac C.
Hemmings and Mary Sue Hemmings, docket No. 9710-90.  (The names
Isaac C. Hemmings and Mary Sue Hemmings refer to the same
individuals as the names I.C. Hemmings and Sue B. Hemmings,
respectively.)

MEMORANDUM OPINION

DAWSON, Judge: These consolidated cases were assigned to Special Trial Judge Carleton D. Powell pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.[2]  The Court agrees with and adopts the opinion of the Special Trial Judge that is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

POWELL, Special Trial Judge:  Respondent determined deficiencies and additions to tax in petitioners' Federal income taxes as follows:

I.C. Hemmings and Sue B. Hemmings

|  |  |  | Additions to Tax | | |
| Docket No. | Year | Deficiency | Sec.6653(a)(1) | Sec.6653(a)(2) | Sec.6661 |
| 41407-85 | 1978 | $1,111,073 | $55,554 | -- | -- |
|  | 1979 | 2,626,613 | 131,331 | -- | -- |
|  | 1980 | 1,801,785 | 90,089 | -- | -- |
| 14273-86 | 1981 | 3,971,519 | 198,576 | [1] | -- |
| 9710-90 | 1983 | 560,882 | 28,044 | [2] | $140,221 |
|  | 1984 | 87,362 | 4,368 | [3] | 21,841 |

[1] 50 percent of the interest due on $3,971,519.
[2] 50 percent of the interest due on $560,882.
[3] 50 percent of the interest due on $87,362.

---

[2]  Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Claude P. Brown and Estate of Mary Stroud Brown,
Deceased, Claude P. Brown, Executor

| Docket No. | Year | Deficiency | Addition to Tax Sec. 6653(a)(1) |
|---|---|---|---|
| 14270-86 | 1981 | $9,956,314 | $4,978,157 |

Respondent also determined with respect to petitioners I.C. Hemmings and Sue B. Hemmings that the entire deficiency amounts for 1978 and 1979 and $1,667,468 of the deficiency for 1980 are substantial underpayments due to tax-motivated transactions under section 6621(d) and that the increased rate of interest under section 6621(b) is applicable.

Petitioner I.C. Hemmings (Mr. Hemmings) and petitioner Sue B. Hemmings (Mrs. Hemmings) (collectively the Hemmingses), resided in Florida at the time their petitions were filed in docket Nos. 41407-85, 14273-86, and 9710-90. Petitioner Claude P. Brown (Mr. Brown) resided in Florida at the time the petition was filed in docket No. 14270-86. Pursuant to an Order of this Court dated February 28, 1996, these cases were consolidated for purposes of briefing and opinion.

After concessions, the issues are: (1) Whether Mrs. Hemmings is entitled to relief under the so-called innocent spouse provisions of section 6013(e) for any of the taxable years 1978, 1979, or 1980; (2) whether Mr. Brown and/or the Hemmingses made a valid election pursuant to sections 508 and/or 509 of the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, 95 Stat. 172, 333, with respect to their commodity trading activities for

the taxable year 1981; and (3) the fair market value on the date of contribution of 24 boxes of gemstones donated by Mr. Hemmings to the Gospel Fellowship Association in 1984.

## Background

Mr. Brown is the father of Mrs. Hemmings and at one time was the sole owner of Brown Transport Corp. (Brown Transport), a trucking company. Mrs. Hemmings, a former school teacher, obtained a B.A. in education from Emory University and a master's degree in early childhood education. Mrs. Hemmings married Mr. Hemmings in 1974, at which time she resigned from teaching and afterwards devoted her time to being a mother and housewife.

After service with the U.S. Marine Corps, Mr. Hemmings performed various jobs in the trucking industry, including loading and driving trucks. He attended Woodrow Wilson Law College at night. Mr. Hemmings graduated in 1959 and soon thereafter obtained employment at Brown Transport. He never practiced law or passed the bar. Around 1968, Mr. Hemmings became president and chief executive officer of Brown Transport.

Through the years, Mr. Hemmings incrementally purchased stock in Brown Transport. Brown Transport grew rapidly and the Hemmingses profited as a result. By 1978 the Hemmingses collectively owned assets worth in excess of $30 million, including a
30-percent interest in Brown Transport valued at $20 million, truck stops, residences, an airplane, a boat, and an ownership

interest in a manufacturing plant and construction company.  By the mid-1980's, Brown Transport was the ninth largest trucking company in the United States.  Mrs. Hemmings' net worth was $4 to $5 million and consisted of real estate.

Between 1978 and 1986 Mr. Hemmings speculated in commodity and treasury bill futures through various brokers and investment advisers, including E.F. Hutton & Co., Merrill Lynch, ACLI Government Securities, Inc. (ACLI), and Elms Management Services, Inc. (ELMS).[3]  Some of these transactions, and for our discussion here primarily the ACLI[4] and ELMS transactions, were straddles that purportedly produced substantial ordinary or short-term capital losses in earlier years and in subsequent years produced capital gains.  The validity of these losses was challenged by the Commissioner, and notices of deficiency were issued to the Hemmingses and Mr. Brown for each year from 1978 to 1986.[5]

ACLI and ELMS Transactions

The only shareholders of Brown Transport were Messrs. Brown and Hemmings.  The expansion of Brown Transport required enormous amounts of capital.  Brown Transport was a so-called S

[3]  As we understand, Index, Inc. acted as an adviser or broker to Messrs. Hemmings and Brown on trading conducted through ACLI, and ELMS played a similar role on trading conducted through Pershing & Co.

[4]  The name Index, Inc. also is used.  This is another name for the ACLI transactions.

[5]  Mr. Brown did not receive a notice of deficiency for the taxable year 1984.

corporation taxable under sections 1371 to 1379. The undistributed taxable income was included in the gross income of the shareholders. Sec. 1373(a). While Brown Transport generated a large amount of income, income taxes on its shareholders substantially reduced the amount of capital they could invest, and the needed capital was in part generated from the purported deferral of income tax generated from the ACLI and ELMS transactions. Accordingly, the tax deferral efforts focused on the tax labilities of Messrs. Brown and Hemmings, both of whom had transactions with ACLI and ELMS.

The parties have not suggested that there were material differences between the ACLI and ELMS programs, and consistent with this approach we treat the programs as being substantially similar in all relevant aspects. W. Paul Harris (Mr. Harris), a certified public accountant for Brown Transport, Mr. Brown, and the Hemmingses, primarily handled the ACLI and ELMS transactions.

The ACLI transactions involved purported straddles of forward contracts for securities issued by the Government National Mortgage Association commonly called "Ginnie Mae". The sides of the straddles involved commitments to purchase millions of dollars of these securities. The loss legs of the contract straddles would be "canceled", purportedly giving rise to an ordinary loss rather than a capital loss. The ELMS transactions were similar, but the underlying securities were Treasury bills and the purported trades were transacted with Arbitrage

Management Investment Co.  Mr. Hemmings did not understand how the trading programs worked.

The starting point of these transactions was determining the amount of losses that needed to be generated in order to substantially reduce or eliminate the Hemmingses' taxable income. Mr. Harris supplied these figures to ACLI and/or ELMS.  Mr. Hemmings was told that he would not make a profit from these transactions, and that, in return for the fees paid, losses would be produced to defer taxes, followed by the realization of capital gains in future years in amounts commensurate with the losses.  The purpose of the transactions was to shelter income. Unlike other commodities or financial instrument transactions, Mr. Hemmings was not required to maintain a margin account, and, other than the initial fees paid for the program, there was no risk of loss from the purported trading.  Also, unlike other futures transactions, Mr. Hemmings was not consulted when changes were made in these accounts.  Changes in the programs were made under a power of attorney held by the sponsor of the programs.

The Hemmingses settled most of the issues involving the taxable years 1978 to 1980.  They conceded the losses claimed from the ACLI and ELMS transactions and paid approximately $3,500,000 in taxes and interest.  In deciding to settle the tax issues arising from the ACLI and ELMS transactions, Mr. Hemmings became convinced that the purported transactions never took place.

The Hemmingses' Prosperous Days and Hard Times

Prior to and during the late 1970's and early 1980's, the Hemmingses were, at least on paper, wealthy. Mr. Hemmings' salary from Brown Transport was approximately $400,000, and he owned stock in Brown Transport and other assets. Mrs. Hemmings owned several parcels of real property that had a value of approximately $4,000,000. The annual income from these properties was between $300,000 and $450,000. These properties had been given to her by her father and/or inherited from her mother. In 1979 the Hemmingses sold their residence in Atlanta for $430,000 and purchased a residence in North Palm Beach, Florida, for approximately $700,000, including remodeling.

Mr. Hemmings was essentially a "workaholic" for Brown Transport. Mrs. Hemmings was a housewife and knew nothing about Brown Transport. Mr. Hemmings did not generally discuss financial affairs in detail with her; Mrs. Hemmings was aware, however, that he had investments in other businesses and traded commodities. The incomes of both Mr. and Mrs. Hemmings were deposited into one account. From that account, Mrs. Hemmings received approximately $2,000 per month for personal and household expenses. If she needed further funds generally they would be deposited in the household account. Given the wealth of the Hemmingses, their lifestyle was not lavish and that lifestyle did not change during the ACLI and ELMS years. As already mentioned, the expansion of Brown Transport required large

amounts of money, and the funds from Mr. Hemmings' account were used to satisfy that need in part.

The Hemmingses' Federal income tax returns were prepared by Mr. Harris, whose firm was in Atlanta.  Mr. Harris was also the accountant for Brown Transport and for Mrs. Hemmings' father.  If Mrs. Hemmings was not available when the returns were due, Mr. Hemmings would sign the returns for her with her consent.  At some time during this period, Mr. Hemmings explained that the ACLI and ELMS losses were to defer income to a later period. Mrs. Hemmings had faith in Mr. Harris, and she did not question the tax returns.  Mr. Hemmings did not explain to her the mechanics of the transactions because he did not understand the mechanics of the transactions himself.

Prior to 1981, Messrs. Brown and Hemmings had traded with E.F. Hutton & Co.  In approximately 1981, they opened discretionary trading accounts with ContiCommodities, Inc. (Conti).  Mr. Hemmings traded with Conti until 1984 when Conti liquidated their accounts creating substantial losses.  In 1985 Conti sued Messrs. Brown and Hemmings, and they counterclaimed against Conti.  Between 1985 and 1994, the Hemmingses paid approximately $8,000,000 in litigation fees in connection with the Conti litigation.  The Conti litigation was ultimately settled in 1993.  The terms of the settlement were placed under seal and cannot be publicly disclosed.  But, as a result of the

settlement, Mrs. Hemmings received $600,000 that was immediately transferred to Mr. Hemmings and used to pay his other debts.

Until 1989 funds to support the Conti litigation came in large part from Brown Transport. In that year, however, Brown Transport suffered severe losses and was placed in bankruptcy. Ultimately, the assets of Brown Transport were liquidated. In order to sustain the Conti litigation and to pay other debts, Mr. Hemmings borrowed money and Mr. and Mrs. Hemmings sold almost all of their assets. They sold their house, their furniture, the luxury cars, the boat, the airplane, and some jewelry. As of the time of the trial, Mrs. Hemmings owned one piece of real estate that had a value of approximately $400,000. When the residence and Mrs. Hemmings' other properties were sold, Mr. Hemmings borrowed the proceeds from Mrs. Hemmings and the proceeds were used to pay debts of Mr. Hemmings and costs of the Conti litigation. Mr. Hemmings has a negative net worth.

ERTA Sections 508(c) and 509 Elections

During 1981 both Messrs. Brown and Hemmings maintained accounts at E.F. Hutton & Co. and Conti for trading regulated commodity futures accounts. Some contracts were entered into prior to June 23, 1981, and others after that date. Sections 501 to 509 of the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, 95 Stat. 172, 323-333, made certain changes in the taxation of straddle and regulated futures contract transactions that were generally applicable to property acquired or positions

established after June 23, 1981.  ERTA secs. 503, 508(a), 95 Stat. 327, 333.  However, under ERTA section 508(c), 95 Stat. 333, a taxpayer could elect to have the provisions of ERTA sections 503-509, 95 Stat. 327-333, apply to all regulated futures contracts or positions held by the taxpayer on June 23, 1981.  Under ERTA section 509, 95 Stat 333, a taxpayer could elect to have all regulated futures contracts held by the taxpayer during a taxable year that included June 23, 1981, marked to market and taxed under ERTA section 509.  The elections under ERTA sections 508 and 509 are referred to as "the transitional rule elections."

In preparing Messrs. Brown and Hemmings' returns for 1981, Mr. Harris, their accountant, was aware of the changes made by ERTA and the transitional rule elections.  Mr. Harris, however, was informed by Conti that the trading with Conti resulted in losses that precluded any benefit from use of the transitional rule elections.  As a result, Messrs. Brown and Hemmings did not make any transitional rule elections on their 1981 returns.

Upon examination of the 1981 returns, respondent disallowed the losses from the Conti transactions on the grounds that

> the transactions were preconceived shams lacking economic substance.  Further, the transactions and losses did not occur or occur in the manner claimed.
>
> Further, recognition of the claimed deductions, income, gains and losses would distort the economic reality of the entire transaction.  No genuine loss occurred, the alleged losses were but one step in a series of

integrated transactions, and the entire transaction lacked economic reality.

Additionally, the claimed deductions and losses are disallowed because of the lack of any profit motive. Moreover, the claimed deductions and losses are disallowed because they do not clearly reflect income.

The parties have stipulated that Messrs. Brown and Hemmings are not entitled to the losses claimed with respect to the Conti transactions. Since the Conti losses have been disallowed, Messrs. Brown and Hemmings believe that it is now beneficial to invoke either of the transitional rule elections. In their petitions, Messrs. Brown and Hemmings seek to make an election under ERTA section 509. By amended petitions filed July 7, 1986, Messrs. Brown and Hemmings purported to supply information required by ERTA section 509(a). By amendments to the amended petitions, filed May 31, 1995, Messrs. Brown and Hemmings, in the alternative, seek to make an election under ERTA section 508(c). Respondent takes the position that these elections are untimely and invalid.

Charitable Contribution Deduction

In 1982, Mr. Hemmings owned a 37-foot Italian speedboat (the boat) that he docked at a yacht club in West Palm Beach, Florida. A boat broker, referred to only as "Don", maintained an office at the yacht club. Don approached Mr. Hemmings on behalf of an unidentified individual (the buyer) who had expressed an interest in purchasing the boat. Mr. Hemmings initially refused to consider any offer. Don and the buyer persisted in their efforts

to obtain the boat and Mr. Hemmings decided to sell. Don then informed Mr. Hemmings that the buyer wanted to trade 24 boxes of gemstones (the gemstones) for the boat. Mr. Hemmings told Don that if Don bought the boat and traded it for the gemstones, Mr. Hemmings would buy the gemstones from him. This course of action eventually was followed.

At Mr. Hemmings' request, Don provided an appraisal that indicated a value of approximately $400,000 for the stones. Mr. Hemmings subsequently purchased the gemstones with a $150,000 cashier's check from Citizens & Southern National Bank. Soon thereafter, Mr. Hemmings, concerned that he might have been swindled, obtained his own appraisal of the value of the gemstones. That appraisal was consistent with the other appraisal.

Mr. Hemmings attempted to sell the gemstones but found no buyers. Mr. Hemmings did find dealers willing to sell the gemstones on consignment, but he was uncomfortable with this arrangement and instead donated the gemstones to the Gospel Fellowship Association (Gospel Fellowship) in 1984.

On their 1984 Federal income tax return, the Hemmingses claimed a deduction for a charitable contribution in the amount of $320,756, reflecting the alleged value of the gemstones when donated. In the notice of deficiency issued to the Hemmingses for 1984, respondent determined that they were not entitled to the claimed charitable contribution deduction because they did

not establish that (1) they actually acquired the gemstones; (2) they had any basis in the gemstones; or (3) the gemstones had any value.  At trial respondent stipulated that the Gospel Fellowship received the gemstones from petitioner.  The Hemmingses have abandoned their claim that the value of the gemstones was $320,756, but now contend that the value was $150,000.

## Discussion

### Innocent Spouse

The parties agree that Mr. and Mrs. Hemmings are not entitled to claim the losses resulting from the ACLI and ELMS transactions.  Mrs. Hemmings contends, however, that she is entitled to relief as a so-called innocent spouse under section 6013(e) for the taxable years 1978, 1979, and 1980.[6]  For Mrs. Hemmings to prevail, she has the burden of establishing:  (1) That a joint return was made; (2) that there was a substantial understatement of tax and that the understatement was due to grossly erroneous items attributable to Mr. Hemmings; (3) that, in signing the returns, she did not know, or have reason to know, of the substantial understatement; and (4) taking into account

---

[6]    Prior to its amendment in 1984, sec. 6013(e) only granted innocent spouse relief in cases where the understatement was attributable to omissions of income.  E.g., Vesco v. Commissioner, T.C. Memo. 1979-374.  The years before the Court here are 1978, 1979, and 1980.  Sec. 424(a) of the Tax Reform Act of 1984 (Division A of the Deficit Reduction Act of 1984), Pub. L. 98-369, 98 Stat 494, 801-802, amended sec. 6013(e) to extend to cases where an understatement of income results from a disallowed deduction.  The amendment applies retroactively to all open years to which the Internal Revenue Code of 1954 applies.

all the facts and circumstances, it would be inequitable to hold her liable for the deficiencies. Sec. 6013(e)(1)(A) through (D). In addition, the understatement must exceed 10 percent of her adjusted gross income for the preadjustment year. Sec. 6013(e)(4).

Respondent concedes that there were joint returns filed, that there were substantial understatements attributable to Mr. Hemmings, and that the requirements of section 6013(e)(4) are met. We, therefore, are faced with the questions whether the ACLI and ELMS deductions are grossly erroneous items, whether Mrs. Hemmings knew or had reason to know of the substantial understatements, and whether it would be inequitable to hold her liable for the resulting deficiencies.

A. Grossly Erroneous Items

Not all disallowed deductions are grossly erroneous items. Douglas v. Commissioner, 86 T.C. 758, 763 (1986). The phrase includes "any claim of a deduction * * * in an amount for which there is no basis in fact or law." Sec. 6013(e)(2)(B). A deduction has no basis in fact where the transaction never took place and has no basis in law where no substantial legal argument can be made to support its deductibility. Douglas v. Commissioner, supra at 762-763.

Mr. and Mrs. Hemmings claimed deductions for losses, and respondent disallowed the deductions in this case on the grounds, inter alia, that they had no basis in fact and no basis in law

(the transactions were "shams" and/or were not "bona fide").  Mr. and Mrs. Hemmings filed petitions in which it is alleged that the transactions were not shams and were bona fide.  In the answers, respondent denied these allegations.  Once section 6013(e) was raised, the positions of the parties underwent a radical metamorphosis.

On one hand, Mrs. Hemmings argues that these transactions are similar to those encountered in Freytag v. Commissioner, 89 T.C. 849 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other issues 501 U.S. 868 (1991), where the Court determined that transactions involving straddles of Ginnie Maes and other financial instruments were illusory, fictitious, and not bona fide.  Respondent, on the other hand, does not seek to characterize the transactions, but rather takes the position that Mrs. Hemmings has not shown that the transactions are of the nature of those discussed in Freytag.

In Freytag the Court found that the First Western Government Securities (First Western) trading program involving straddles of forward contracts was not bona fide.  This finding was based on a number of "gremlins" in the program.  Among the more salient gremlins were the following:  The customers' out-of-pocket losses were limited to the amounts paid; the amounts paid to the so-called margin account determined the fees paid; the starting point for the alleged trading program was the amount of tax losses that were requested by the customer; the lack of

communication between First Western and the customer; and the closings of the legs were done by cancellations and assignments of the contracts. Freytag v. Commissioner, 89 T.C. at 877-882. We also determined that, even if the transactions were bona fide, the primary motivation for entering into the transactions was not for economic profit. Id. at 882-886.

The testimony of Messrs. Hemmings and Harris reveals many of the same gremlins in the ACLI and ELMS programs. Furthermore, Mr. Hemmings testified that the sole reason for entering into the transactions was to defer the bites of income taxes. While Mr. Harris suggested that there were other economic reasons for entering into the transactions, he could not explain how, apart from the purported tax deferral, the programs were economically viable.

Mrs. Hemmings has the burden of establishing that the transactions were grossly erroneous. While that burden never shifts, at this point it seems to us that she has established a prima facie case that the transactions were not bona fide and would not be recognized, and the burden of going forward is on respondent. See Adler v. Commissioner, 85 T.C. 535, 540 (1985). Respondent introduced no evidence to suggest that either the gremlins were not present or that the transactions were primarily driven by economic motives.[7] Given the state of these records,

_____

[7] On brief, respondent argues that the testimony of David Aughtry was insufficient to establish the nature of these

- 18 -

we conclude that the ACLI and ELMS transactions in this case were not bona fide, and that the primary motive for entering into the transactions was not for economic profit but rather for tax purposes.  As such, the transactions had no basis in fact or law and fall within the ambit of being grossly erroneous items.

In reaching this conclusion, we recognize that in Stoller v. Commissioner, T.C. Memo. 1990-659, affd. in part and revd. in part 994 F.2d 855 (D.C. Cir. 1993), supplemented 3 F.3d 1576 (D.C. Cir. 1993), the Court recognized certain straddle transactions wherein some of the same considerations or gremlins were present.  It is important to note, however, that respondent's expert in that case conceded that the transactions were bona fide.  Mrs. Hemmings has made no such concession.[8]

Respondent also argues that this case is controlled by Russo v. Commissioner, 98 T.C. 28 (1992).  In Russo, this Court denied petitioner/wife's motion to amend the petition to raise the section 6013(e) innocent spouse defense.  The deficiency resulted

---

transactions.  To a great extent we agree.  But, we have not based our conclusion on Mr. Aughtry's testimony, rather we focus on the facts concerning the transactions testified to by Messrs. Hemmings and Harris.  These testimonies are not controverted.

[8]   Respondent contends that since Mr. and Mrs. Hemmings were allowed deductions for some of the ACLI and ELMS transactions in the settlement, the transactions must have had substance.  We do not know the considerations that brought forth the settlement agreement.  But, to a certain extent in complex and multi-issue cases such as these, there is a certain amount of "horse trading" that may produce peculiar results.  This is particularly true where the ACLI and ELMS transactions are not the only issues.

from straddle transactions losses discussed in Glass v. Commissioner, 87 T.C. 1087 (1986).[9]  In disallowing those losses, we assumed that "the commodity options and futures contracts which petitioners entered into were actual contracts. * * *. Thus, we are here focusing our attention * * * on a question of law."  Id. at 1172.  Consistent with this, in Russo we held, inter alia, that the losses claimed were not grossly erroneous items because they were not without basis in law or fact but rather "the losses claimed were not 'intended' by the relevant Code sections and were not allowable under the rationale of Gregory v. Helvering, 293 U.S. 465, 469 (1935)."  Russo v. Commissioner, supra at 33.  That situation is distinctly different from here where the evidence indicates that these transactions were not bona fide and had no basis in fact.

B. Lack of Knowledge and/or Reason to Know

Mrs. Hemmings must establish that she did not know and had no reason to know that the deductions gave rise to the

---

[9]  Glass v. Commissioner, 87 T.C. 1087 (1986), was affd. sub nom. Bohrer v. Commissioner, 945 F.2d 344 (10th Cir. 1991), affd. sub nom. Lee v. Commissioner, 897 F.2d 915 (8th Cir, 1989, affd. sub nom. Kielmar v. Commissioner, 884 F.2d 959 (7th Cir. 1989), affd. sub nom. Dewees v. Commissioner, 870 F.2d 21 (1st Cir. 1989), affd. sub nom. Freidman v. Commissioner, 869 F.2d 785 (4th Cir. 1989), affd. sub nom. Keane v. Commissioner, 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. Ratliff v. Commissioner, 865 F.2d 97 (6th Cir. 1989), affd. sub nom. Killingsworth v. Commissioner, 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. Kirchman v. Commissioner, 862 F.2d 1486 (11th Cir. 1989), affd. sub nom. Yosha v. Commissioner, 861 F.2d 494 (7th Cir. 1988), affd. sub nom. Herrington v. Commissioner, 854 F.2d 755 (5th Cir. 1988).

substantial understatements of tax. Sec. 6013(e)(1)(C). It does not seem disputed that Mrs. Hemmings did not know of the substantial understatements. Rather, the dispute focuses on whether she had reason to know. In <u>Kistner v. Commissioner</u>, 18 F.3d 1521, 1525 (11th Cir. 1994), revg. T.C. Memo. 1991-463, the Court of Appeals for the Eleventh Circuit, to which an appeal in this case would lie, observed:

> A spouse has "reason to know" if a reasonably prudent taxpayer under the circumstances of the spouse at the time of signing the return could be expected to know that the tax liability stated was erroneous or that further investigation was warranted. * * * The courts have recognized several factors that are relevant in determining the "reason to know," including (1) the alleged innocent spouse's level of education; (2) the spouse's involvement in the family's business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of income, and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning the couple's finances. * * *

See also <u>Friedman v. Commissioner</u>, 53 F.3d 523 (2d Cir. 1995), affg. in part and revg. and remanding in part T.C. Memo. 1993-549; <u>Jacoby v. Commissioner</u>, T.C. Memo. 1996-477.

While Mrs. Hemmings does have a college education, there was nothing in her education that would or should have alerted her to the pitfalls of this situation. She was not educated in any financial or business disciplines. There were no major differences--before, during, or after the period in which these deductions were claimed--in the Hemmingses' lifestyle. For people with their wealth, their lifestyle was comfortable but not

exorbitant.  More important, Mrs. Hemmings played no role in the family's business and/or investments.  She did not even control the income from her assets.  While she was not subject to any abuse, it is obvious that Mr. Hemmings totally dominated the financial side of the marriage.  It is true that Mr. Hemmings did not attempt to deceive her and told her that the losses were part of a tax deferral strategy.  But, she also relied on Mr. Harris, who was a certified public accountant and had prepared the Hemmingses' and Mr. Brown's tax returns in the past.  In this regard, we note that the Hemmingses' tax returns are extremely complex in which large gains and losses were reported for other trading activities.  Considering all of the circumstances concerning these returns, we do not believe that Mrs. Hemmings had any reason to know that there were substantial understatements of tax on these returns.

## C. Equitable Considerations

The final question is whether, taking into account the facts and circumstances, it would be inequitable to hold Mrs. Hemmings liable for deficiencies attributable to the substantial understatements.  Sec. 6013(e)(1)(D).  We are primarily concerned whether Mrs. Hemmings significantly benefited from the erroneous items.  Belk v. Commissioner, 93 T.C. 434, 440 (1989); see also sec. 1.6013-5(b), Income Tax Regs.  Normal support, measured by the circumstances of the parties, is not a significant benefit. Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989); sec.

1.6013-5(b), Income Tax Regs.  Unusual support and receipt of property, however, would constitute a significant benefit.  See S. Rept. 91-1537 at 3-4 (1970), 1971-1 C.B. 606, 607-608.  In the instant cases, there is no evidence that Mrs. Hemmings derived any benefits from the understatements generated by the ACLI and ELMS transactions.  The benefits, such as they were, inured to Mr. Hemmings, Mr. Brown, and Brown Transport.  When we look at the bottom line, Mrs. Hemmings has suffered a severe financial hemorrhage.  Prior to and during the ACLI and ELMS period she had assets valued at approximately $4,000,000.  None of these assets were derived from the tax savings.  Currently she has assets valued at approximately $400,000.  It may be that she also has notes from her husband totaling $4.5 million for moneys lent to him.  Her husband, however, has a negative net worth, and, while the notes may not be valueless, their value is highly suspect.  We conclude that it would be inequitable to hold Mrs. Hemmings liable for the underpayments attributable to the ACLI and ELMS transactions.

In sum, we find that Mrs. Hemmings satisfies the requirements of section 6013(e) and qualifies as an innocent spouse.

ERTA Sections 508 and 509

Section 1256 was enacted by ERTA sections 508 and 509, 95 Stat. 333.  Section 1256 generally provides, inter alia, that regulated futures contracts must be marked to market on the last

business day of the taxable year and any gain or loss on those contracts shall be treated as a 40-percent short-term capital gain or loss and a 60-percent long-term capital gain or loss. Section 1256 applies to all positions acquired after June 23, 1981. ERTA sec. 508(a), 95 Stat. 333. Unless an election was made under sections 508(c) or 509 of ERTA (collectively the transitional rule elections), the law in effect prior to the enactment of section 1256 applied to all regulated futures contracts acquired on or before June 23, 1981 (pre-June 24 contracts). Secs. 5c.1256-1 and 5c.1256-2, Temporary Income Tax Regs., 47 Fed. Reg. 38689 (Sept. 2, 1982).[10] The deadline for an election under section 509 of ERTA was established by Congress in ERTA section 509(b), 95 Stat. 334. Congress deferred to the Secretary of the Treasury (the Secretary) to set the time limit on the exercise of an elective choice under ERTA section 508(c), 95 Stat. 333, and the Secretary established the time limit in section 5c.1256-1(b), Temporary Income Tax Regs., 47 Fed. Reg. 38689 (Sept. 2, 1982). Both transitional rule elections were required to be made by the due date (including extensions) of the taxpayer's Federal income tax return for the taxable year that included June 23, 1981.

---

[10] Secs. 5c.1256-1 and 5c.1256-2, Temporary Income Tax Regs., 47 Fed. Reg. 38688, 68689 (Sept. 2, 1982), remain in effect until superseded by final regulations on this subject. T.D. 7826, 1982-2 C.B. 196. No final regulations have been issued.

After considering the merits of the transitional rule elections, Mr. Brown and Mr. Hemmings (collectively petitioners) filed their 1981 Federal income tax returns without making either of the elections. The reporting of the pre-June 24 positions reflected that choice. Petitioners, by amended petitions, now seek to alter that choice long after the deadline for filing such elections contained in the statutes and regulations.

Where Congress has set an explicit time limit for making an election, extending the time beyond the limits prescribed is a legislative not a judicial function. Riley Co. v. Commissioner, 311 U.S. 55, 58 (1940); see also Scaife Co. v. Commissioner, 314 U.S. 459, 462 (1941); Brutsche v. Commissioner, 585 F.2d 436, 439 (10th Cir. 1978), vacating and remanding 65 T.C. 1034 (1976); Frentz v. Commissioner, 44 T.C. 485, 490 (1965), affd. 375 F.2d 662 (6th Cir. 1967); Taylor v. Commissioner, T.C. Memo. 1987-399; Welsh v. United States, 2 Cl. Ct. 417, 420 (1983). Accordingly, petitioners' untimely elections under ERTA section 509 cannot be given effect, and we turn to petitioners' untimely elections under ERTA section 508(c).

In contrast to the deference afforded Congressionally created time limits, the adherence to administratively created time limits is not always mandated, even where that time limit is created pursuant to a Congressional delegation of authority. See Dougherty v. Commissioner, 60 T.C. 917, 938 (1973). Petitioners assert that their untimely elections should be respected because

their original failure to make the elections was based on a material mistake of fact, and their untimely elections should be recognized.  Petitioners rely on Meyer's Estate v. Commissioner, 200 F.2d 592 (5th Cir. 1952), revg. 15 T.C. 850 (1950), and Plumb v. Commissioner, 97 T.C. 632 (1991).[11]

Plumb v. Commissioner, supra, is inapposite.  In Plumb, this Court held that a taxpayer who attempted to make an election that was not available under the law had made no election and should be treated as such.  Petitioners originally chose between two legally available alternatives.  Thus, Plumb does not provide a basis for disregarding their original decision not to make elections under ERTA section 508(c).  Cf. Miller v, Commissioner, 99 F.3d 1042 (11th Cir. 1996); Branum v. Commissioner, 17 F.3d 805, 809 (5th Cir. 1994).

In Estate of Meyer v. Commissioner, 15 T.C. 850 (1950), revd. 200 F.2d 592 (5th Cir. 1952), the parties stipulated that

---

[11] Taxpayers have been allowed to make an election that did not literally comply with certain procedural requirements governing the time provided for making the election.  See, e.g., Taylor v. Commissioner, 67 T.C. 1071 (1977); Dougherty v. Commissioner, 60 T.C. 917 (1973).  Such decisions generally conclude that the elections were timely, relying on (1) substantial compliance with the procedural requirements within the time limit for making the election; (2) an expression of intent to make the election within the time limit; or, at least, (3) a lack of an election against or conduct that is inconsistent with the position the taxpayer ultimately did adopt.  See, e.g., American Air Filter Co. v. Commissioner, 81 T.C. 709 (1983); Taylor v. Commissioner, supra; Dougherty v. Commissioner, supra. Petitioners do not assert that their elections were timely under this line of cases.

the taxpayers relied on an understated corporate earned surplus figure, as shown by an audit of certified public accountants, in making an election to liquidate under section 112(b)(7) of the Internal Revenue Code of 1939, and the actual earned surplus figure was more than 10 times the figure relied on.  Under these circumstances, the Court of Appeals for the Fifth Circuit held that the election could be withdrawn on the ground that it was based on a material mistake of fact.  Meyer's Estate v. Commissioner, 200 F.2d at 596-597.

While this Court has not adopted the reasoning of Meyer's Estate v. Commissioner, 200 F.2d at 592 (see Johnson v. Commissioner, T.C. Memo. 1991-645, affd. without published opinion 989 F.2d 484 (1st Cir. 1993)), an appeal in this case lies to the Court of Appeals for the Eleventh Circuit in which Meyer's Estate is precedent.[12]  Nonetheless, if petitioners are to be allowed to make elections at this time in reliance upon Meyer's Estate, they must establish that their original elections were based upon a material mistake of fact and not a mistake of law.  Rule 142(a); Bankers & Farmers Life Ins. Co. v. United States, 643 F.2d 234 (5th Cir. 1981).  It is one thing to allege simply that there was a mistake in regarding the Conti losses as

_____

[12]    As expressed in Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Court of Appeals for the Eleventh Circuit follows precedent of those cases decided by the Court of Appeals for the Fifth Circuit prior to September 30, 1981.

deductible.  It is not clear, however, whether this mistake was based on an erroneous conclusion of fact or law.  For example, if the Conti transactions never took place, i.e., they were "factual shams", it is arguable the mistake was predicated on an erroneous factual conclusion.  On the other hand, if the transactions did take place but would not be recognized because they were not entered into primarily for profit, the mistake was not one of fact, but of the legal consequences of the facts.  See, e.g., Freytag v. Commissioner, 904 F.2d 1011 (5th Cir. 1990), affd. on other issues 501 U.S. 868 (1991), affg. 89 T.C. 849 (1987); Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966), affg. 44 T.C. 284 (1965).

With the records that we have, petitioners concede that the Conti transactions "have no effect for tax purposes, and Petitioners will not recognize any gains, losses, income or expenses arising from transactions in non-regulated government securities traded by Conti".  But, we do not know the basis of this concession.  Petitioners have consistently maintained that a great number of the Conti transactions actually took place.  Further, while petitioners' cases in the Multi-District Litigation involving Conti were settled, the court there found that petitioners could not identify so-called bad or sham transactions.  In re ContiCommodity Services, Inc. Securities Lit., 733 F. Supp. 1555, 1564 (N.D. Ill. 1990), revd. on other

issues sub nom. <u>Brown v. United States</u>, 976 F.2d 1104 (7th Cir. 1992).

Petitioners here face some of the same problems that Mrs. Hemmings faced with respect to the ACLI and ELMS transactions. But, we note that Mr. Hemmings testified that his trading with E.F. Hutton & Co. and Conti was distinctly different from his trading with ACLI and ELMS as discussed, <u>supra</u>. Moreover, there is no evidence in this record that the Conti trading suffered from the same gremlins that were present in the ACLI and ELMS alleged trading. Cf. <u>Freytag v. Commissioner</u>, <u>supra</u>. We conclude that petitioners have not shown that their elections when the returns were filed were based on a material mistake of fact and, accordingly, they are not entitled to abandon their original choice and make untimely elections under ERTA section 508(c) or 509. We apply the general rule that a taxpayer who makes an elective choice is bound by that choice. <u>Roy H. Park Broadcasting v. Commissioner</u>, 78 T.C. 1093, 1134 (1982).

Charitable Contribution

Although this is a tale seemingly scripted by the ghost of Damon Runyon, respondent concedes that the gemstones exist and were donated to the Gospel Mission. While the tale seems farfetched, there are some gems of truth with which we must deal. In our findings of fact we have outlined the rather bizarre genesis of acquiring the gems, and while that genesis is bizarre, Mr. Hemmings' testimony to that effect, corroborated by other

evidence, appeared to be trustworthy.  Thus, we proceed to determine the value of the gemstones.

Section 1.170A-1(c)(1), Income Tax Regs., states that, except for certain adjustments not relevant here,[13] a charitable contribution of property is to be valued at the fair market value of the property at the time of the contribution.  "Fair market value" is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts."  Sec. 1.170A-1(c)(2), Income Tax Regs.  A sale of the same property within a short period of time prior to the valuation date has been described as reliable evidence of value.  Chiu v. Commissioner, 84 T.C. 722, 734 (1985); Hinkel v. Motter, 39 F.2d 159 (D. Kan. 1930).

Respondent argues that Mr. Hemmings has not established the fair market value of the gemstones on the date of contribution.  Mr. Hemmings does not rely on either of the appraisals other than to corroborate the facts concerning his acquiring the gems.

---

[13]   In determining the amount of a charitable contribution of property, the fair market value of the property must be reduced by, inter alia, the amount of gain which would not have been long-term capital gain if the property contributed had been sold by the taxpayer at its fair market value at the time of contribution.  Sec. 170(e)(1)(A); sec. 1.170A-1(c)(1), Income Tax Regs.  The Hemmingses do not assert that the fair market value of the gemstones at the time of contribution exceeded their basis ($150,000).  To the extent the fair market value did exceed basis, such excess would have no impact on the amount of the allowable charitable contribution deduction because of the aforementioned rule.

Rather, he contends that he has established the cost and that the cost approximates the fair market value on the date of contribution.  Mr. Hemmings' Merrill Lynch cash management account shows a check written on October 22, 1982, to C & S National Bank[14] for $150,000 for a cashier's check used to purchase the gemstones.  The statement indicates that his check cleared 3 days later.  The two appraisals introduced into evidence bore dates shortly before the October 22, 1982, purchase and shortly after that date, and are consistent with Mr. Hemmings' testimony.

We conclude that Mr. Hemmings paid $150,000 for the purchase of the gemstones on October 22, 1982, and are left to decide whether this figure should be accepted as the fair market value of the gemstones on the date of contribution.  Respondent agrees that a sale of the same property within a short period of time before the date of contribution may constitute the best evidence of the fair market value.  Respondent contends, however, (1) that the purchase of the gems from Don was not an arm's-length transaction, noting the disparity in value between the appraisals and the purchase price, and (2) that the purchase of the property did not occur within the requisite temporal proximity to adequately establish the fair market value of the gemstones on the date of contribution.

---

[14]  The transcript refers to the CNS National Bank.  This is a typographical error.

Respondent's contention that the purchase of the gemstones was not an arm's-length transaction is not supported by the record. Mr. Hemmings and Don were no more than business acquaintances, and there is no reason to believe that either intended to confer any benefit on the other by paying more or less than the fair consideration in the exchange.

Turning to the proximity of the purchase date to the date of gift, in Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. T.C. Memo. 1963-244, the court found that the purchase price of jewelry over 2 years prior to the contribution was sufficient to establish the fair market value of the jewelry on the date of contribution in the absence of convincing evidence to the contrary. In Jayson v. United States, 294 F.2d 808, 810 (5th Cir. 1961), the court found that the purchase price of land 3-1/2 years prior to its condemnation was evidence of its fair market value on the date of condemnation. Similarly, in United States v. 2,635.04 Acres of Land, 336 F.2d 646, 649 (6th Cir. 1964), the court held that a comparable sale of land in 1954 constituted evidence of the fair market value of the land condemned in 1961.

Respondent has not introduced any evidence of the fair market value of the gemstones on the date of contribution, nor put forth any reason to believe the value of the gemstones diminished between the date of purchase and the date of contribution. Gemstones are durable assets, not easily

susceptible to diminution in value due to wear and tear.  In the absence of any evidence to the contrary, we conclude that the fair market value of the gemstones on the date of contribution was $150,000, the purchase price of the gemstones.

To reflect our conclusions and the concessions of the parties,

<u>Decisions will be entered under Rule 155</u>.